UNITED STATES of America, Plaintiff–Appellee,

v.

Richard CARRILLO, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Ernest BENAVIDEZ, Defendant–Appellant.

Nos. 92–10466, 92–10469.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1993 in No. 92–10466.

Submitted Nov. 1, 1993 in No. 92–10469 *.

Decided Feb. 18, 1994.

As Amended May 17, 1994.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34–4.

Thomas C. Bradley, Assistant United States Public Defender, Reno, Nevada, and Richard F. Cornell, Reno, Nevada, for the defendants-appellants.

William M. Welch, Assistant United States Attorney, Reno, Nevada, for the plaintiff-appellee.

Before: CHOY, CANBY, and NOONAN, Circuit Judges.

CANBY, Circuit Judge.

Following a jury trial, Richard Carrillo and Ernest Benavidez were convicted of numerous charges relating to the possession and distribution of cocaine, including conspiracy with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii). Carrillo and Benavidez now appeal their convictions, alleging that the district court erred (1) by admitting into evidence a purported "profit statement" or "tally sheet" from various drug transactions, (2) by admitting into evi-

dence a post-arrest statement made by Carrillo in response to an officer's question prior to a *Miranda* warning, and (3) by allowing the prosecutor to cross-examine Carrillo about confidential attorney-client communications. Finally, Carrillo and Benavidez allege that the prosecutor engaged in misconduct during closing argument. We affirm.

## I. BACKGROUND

Evidence at trial indicated that a government informant met Richard Carrillo by chance in a bar in Corona, California, in March or April of 1991. After learning that Carrillo was involved in the cocaine business, the informant cultivated a relationship with Carrillo and proceeded with negotiations for the purchase of large quantities of cocaine. In July, the informant paid Carrillo $800 to obtain a one-ounce sample of cocaine. Because the informant was unhappy about the quality of the cocaine, Carrillo later provided free of charge a second sample of cocaine and negotiations continued.

During these negotiations, the informant convinced Carrillo to travel to Reno, Nevada, where the informant, Carrillo, and Benavidez met with Scott Jackson, a Nevada narcotics agent posing as a cocaine dealer. During this meeting both price and quantity were negotiated but not confirmed. Benavidez represented that his wholesale price for the cocaine was $15,000 to $16,000 per kilogram. Many of these negotiations were recorded on videotape or audiotape. Eventually, Carrillo and Benavidez agreed to sell 20 kilograms of cocaine to the government agents for $18,000 per kilogram.

On November 25, 1991, Carrillo agreed to complete the transaction the following day at the informant's apartment. The next day, Carrillo arrived with Benavidez at the apartment. However, the two men brought only a single kilogram of cocaine. When Agent Jackson inquired about the additional 19 kilograms, Benavidez responded that he could obtain only 14 more kilograms and he refused to complete the transaction unless Agent Jackson traveled to Benavidez's home that night. Instead of continuing the operation further, the police arrested Benavidez

and Carrillo and several codefendants who assisted in the cocaine delivery.

After an eight-day jury trial, Carrillo and Benavidez were convicted of all charges. They were sentenced to 121 months of imprisonment for conspiracy with intent to distribute five or more kilograms of cocaine, and were given lesser sentences on each of the other counts, to run concurrently. They now appeal, urging various trial errors.

## II. ANALYSIS

### A. The Admissibility of the Purported Profit Statement

■ At the police station following the arrests, a police officer found a small folded white piece of paper in Benavidez's pocket. The slip of paper, labelled "Exhibit 66" at trial, contained three columns of numbers and letters. It was neither signed nor dated. Because the numbers were consistent with some of the prices and quantities of cocaine that Benavidez negotiated with Agent Jackson, the government argued that the paper was a "tally sheet" or profit statement of Benavidez's potential drug transactions. The district court admitted Exhibit 66 into evidence at trial under the "adopted admission" exception to the hearsay rule.

Benavidez contends that the writing was hearsay, and that its admission accordingly violated Fed.R.Evid. 802. He points out that there was no evidence that the writing on the paper was his, nor was there any showing as to who was the author. But such an unauthenticated statement is not hearsay if the party against whom it is introduced has manifested an adoption of its contents or belief in its truth. Fed.R.Evid. 801(d)(2)(B). We conclude that Benavidez had adopted this statement.

In *United States v. Ospina*, 739 F.2d 448, 451 (9th Cir.), *cert. denied*, 469 U.S. 887, 105 S.Ct. 262, 83 L.Ed.2d 198 (1984), we ruled that business cards that contained handwritten notations and that were found on a dresser in the defendant's motel room constituted adopted admissions and, thus, were not hearsay. One of the business cards bore the phone number of the hotel where the other defendants were staying. The other card

contained the address of the location where the cocaine involved in that case was transferred. *Id.* We accepted the government's view that the business cards were adopted admissions "because they were in the possession of" the defendant and the defendant "acted on the information written on the cards when he travelled to the address written there to pick up the cocaine." *Id.*

We conclude that the facts of this case fall within the rule of *Ospina.* Benavidez negotiated with an undercover agent the terms of a cocaine transaction, including the price and quantity. The figures on the slip of paper apparently represented the profit expected from a 20–kilogram cocaine deal at $18,000 per kilogram and a 15–kilogram cocaine deal at the same price. These prices were consistent with the prices Benavidez had quoted Agent Jackson in negotiations. Likewise, the quantities were consistent with Benavidez's initial agreement to sell 20 kilograms of cocaine and his later statement that he could obtain only 15 kilograms. The district court found that Exhibit 66 was "a record of the negotiations and the profit that might be made" in a cocaine deal. We conclude that this finding is not erroneous. Benavidez manifested adoption of the statement in Exhibit 66 by possessing the slip of paper and negotiating sale prices and quantities for cocaine that were consistent with the figures on the slip of paper.

Benavidez relies principally on *United States v. Ordonez,* 737 F.2d 793 (9th Cir. 1983), but we find that case distinguishable. In *Ordonez,* we ruled that the mere fact that a drug ledger was found in the defendant's apartment was not enough to permit an inference that he had adopted its contents. There was no other evidence of adoption. We accordingly held that the evidence had to be excluded. *Id.* at 800–01.

Here, there was evidence of adoption that went beyond mere possession. The figures written on the paper coincided with Benavidez's negotiations. There is a sufficient link between the writing and Benevidez's actions to permit the district court to find an adoption, within the meaning of *Ospina.* The

district court did not err in admitting Exhibit 66.

B. The Public Safety Exception to the *Miranda* Rule

■ Also admitted into evidence at trial was a statement made by Carrillo before he was given a *Miranda* warning. After Carrillo was arrested and transported to the detention facility, Officer Weeks searched Carrillo. Before beginning, however, the officer asked Carrillo if he had any drugs or needles on his person. Carrillo responded, "No, I don't use drugs, I sell them." Carrillo argues that this statement should have been suppressed because it was made before Carrillo had been given a *Miranda* warning. The district court admitted the evidence under the "public safety" exception to *Miranda. See New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984).

■ In determining whether the public safety exception to *Miranda* applies, "we ask whether there was an objectively reasonable need to protect the police or the public from any immediate danger." *United States v. Brady,* 819 F.2d 884, 888 n. 3 (9th Cir.1987) (*quoting Quarles,* 467 U.S. at 659, 104 S.Ct. at 2649), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). We agree with the district court that Officer Weeks's question stemmed from an objectively reasonable need to protect himself from immediate danger. *See Quarles,* 467 U.S. at 659 n. 8, 104 S.Ct. at 2650 n. 8. Officer Weeks testified that he asks this question as a matter of policy before searching a prisoner to avoid contact with syringes and toxic substances.[1] The risk differs from that presented by a gun, but the danger of transmission of disease or contact with harmful substances is real and serious enough; a pressing need for haste is not essential. *See Brady,* 819 F.2d at 885 (question whether suspect had gun in car, asked after he had been frisked, is within public safety exception).

Our conclusion is buttressed by the non-investigatory nature of the officer's question. The question called for a "yes" or "no," not a

---

1. Weeks testified that during past searches he had been poked by needles and suffered head-aches and skin irritation from contact with illegal drugs.

testimonial response. Ordinarily, a question framed in this manner would not elicit any incriminating evidence not produced by the search itself. After Carrillo gave the incriminating but unrequested response, the officer asked no more questions. Although the test is an objective one, the officer's deliberate refusal to pursue the subject heightens our confidence that, in this case, the narrowly tailored question was a reasonable attempt by a police officer to insure his personal safety in the midst of a search. Consequently, the spontaneous and unrequested response of the suspect was properly admitted under the *Quarles* public safety exception to Miranda. *See also United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir.1981) (spontaneous incriminating admission of a suspect in custody is admissible despite absence of Miranda warning, if in response to question not reasonably likely to elicit incriminating answer).

### C. Cross-examination of Carrillo Regarding Attorney–Client Communications

██ On cross-examination, the district court allowed the prosecutor to inquire whether Carrillo had discussed his testimony with his attorney prior to taking the stand. Carrillo admitted that he had. Next, the prosecutor asked Carrillo about an event that Carrillo had discussed during direct examination that was interrupted by a court recess. The prosecutor used this line of questioning to expose a subtle difference in Carrillo's testimony before and after the recess and, thus, to create an inference that Carrillo's attorney had coached him on the subject during the recess. Carrillo claims that this tactic violated his attorney-client privilege.

██ The privilege does not extend beyond the substance of confidential attorney-client communications. *In re Fischel,* 557 F.2d 209, 211 (9th Cir.1977). Here, the prosecutor's questions did not reach the substance of the legal advice given to Carrillo.

The district court allowed the prosecutor to ask only whether Carrillo met with his attorney and whether his testimony was discussed at those meetings. Coaching is a proper subject of impeachment in cross-examination. *Geders v. United States,* 425 U.S. 80, 88–90, 96 S.Ct. 1330, 1335–1336, 47 L.Ed.2d 592 (1976). The prosecutor did not violate Carrillo's attorney-client privilege by inquiring whether communications occurred and raising the inference of coaching.

### D. Prosecutorial Misconduct

██ In closing argument, defense counsel for both Carrillo and Benavidez implied that the government had willfully withheld a tape recording of conversations that occurred during the cocaine transaction.[2] Defense counsel inferred that the missing tape contained exculpatory evidence, namely, conversations in which government agents expressed skepticism that Benavidez had access to the 14 or 19 additional kilograms of cocaine he had promised. The defense intended to use this skepticism to buttress its theory that Benavidez and Carrillo never truly conspired to distribute five or more kilograms of cocaine, and that contrary statements they made during negotiations were mere braggadocio.[3]

Attacking the missing tape claim in his rebuttal argument, the prosecutor said "... suddenly the missing tape [theory] developed. I may be wrong, and your recollection controls, but I thought we heard that tape being played by the defense as it screeched and made a lot of loud noise. Again, your recollection controls." This apparently was a misstatement of fact because a tape had not been made of the conversation in question.

It is not at all certain that the prosecutor's statement could be considered misconduct. He told the jury that he might be wrong, and said before and after his statement that the jury's recollection controlled. His misstatement has earmarks of inadvertent mistake, not misconduct.

---

**2.** Defense counsel alleged that the government had failed to provide the tape, as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After a hearing on the issue in which the government maintained that no tape was made of this particular conversation, the district court found that no *Brady* violation had occurred.

**3.** Carrillo and Benavidez concede that the alleged prosecutorial misconduct is material to only one of the five counts with which they were charged, conspiracy to possess with intent to distribute five or more kilograms of cocaine.

In any event, the statement could not have prejudiced the defendants. First, the prosecutor himself warned the jury to rely on its own recollection. The court instructed the jurors that "lawyer's statements are not evidence."

Second, the jury heard independent and far more persuasive evidence of the same information that the defense counsel was attempting to convey with the missing tape information. Indeed, while Agent Jackson was testifying, defense counsel played a tape to the jury in which Agent Jackson and the informant agreed that Benavidez did not have the cocaine. The unsubstantiated missing tape inference could provide little additional support for skepticism that the jury had already heard expressed by government agents on tape. The prosecutor's statement therefore was not "likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Sanchez*, 944 F.2d 497, 499 (9th Cir.1991).

Finally, the independent evidence of the guilt of Benavidez and Carrillo was overwhelming. Carrillo and Benavidez engaged in lengthy negotiations with government agents. Carrillo provided the informant two samples of cocaine, one of which was given free of charge. Carrillo and Benavidez travelled to Reno, Nevada, to meet with undercover Agent Jackson who was posing as a large volume cocaine distributor. Benavidez made various representations that he had access to several large suppliers and, at one point, to 40 kilograms of Colombian cocaine. Finally, Carrillo and Benavidez were arrested with a kilogram of cocaine. The evidence indicated that they were arrested with only one kilogram of cocaine, not because they had no access to larger quantities, but because they were experienced and sophisticated in completing drug transactions. In light of the jury instructions, the independent evidence of the same information, and the overwhelming evidence of guilt, any prejudice stemming from the prosecutor's apparent misstatement is negligible. No reversible error occurred.

## III. CONCLUSION

The convictions of Carrillo and Benavidez are AFFIRMED.