**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Francis Joseph REILLY, aka Ian MacCormick, aka Steven James Conner, Defendant–Appellant.**

**No. 99–10360.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 15, 2000

Filed Sept. 11, 2000

Carmen L. Fischer, Phoenix, Arizona; Nancy L. Hinchcliffe, Phoenix Arizona, for the defendant-appellant.

Linda C. Boone, Assistant United States Attorney, Appellate Section, Phoenix, Arizona, for the plaintiff-appellee.

Before: LAY,[1] D. W. NELSON and THOMAS, Circuit Judges.

---

1. The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit,

LAY, Circuit Judge:

On April 8, 1999, a jury convicted Francis Joseph Reilly of Armed Bank Robbery in violation of 18 U.S.C. §§ 2113(a) & (d) and Use of a Firearm During a Bank Robbery in violation of 18 U.S.C. § 924(c)(1). On appeal, Reilly presents three arguments: (1) federal officers failed to comply with the knock and announce requirement under 18 U.S.C. § 3109; (2) the failure to provide Reilly with a *Miranda* warning was not excused by the public safety/officer safety exception, and his statement along with the weapon seized should have been suppressed; and (3) the inevitable discovery doctrine was incorrectly applied, and the evidence seized as a result of the improperly obtained consent to search should have been suppressed. We affirm in part and reverse in part and remand for a new trial.

## I. Background

On May 8, 1998, FBI agents in Flagstaff, Arizona, received a tip from federal agents in Pittsburgh, Pennsylvania, that Reilly was staying with a woman named Doris Lange at the New Earth Lodge in Sedona, Arizona. Reilly and Lange were expected to meet up with another couple at the lodge. Reilly was a suspect in twenty-seven bank robberies in twenty-three cities in ten different states, including the April 9, 1998, robbery of a Norwest Bank in Arizona. Officers also considered him a strong suspect in the armed carjacking of a red Volkswagen Cabriolet in Chattanooga, Tennessee. Numerous photographs, as well as a teletype detailing Reilly's suspected criminal activities, were faxed to the Arizona agents by an agent in Pittsburgh, where Reilly had an outstanding federal arrest warrant for armed bank robbery.

At approximately 5:00 p.m. on May 8, FBI Agents Kim Kelly, Manuel Johnson, and Duncan Edwards set up surveillance at the New Earth Lodge. The officers

sitting by designation.

briefly interrupted their surveillance of the units to speak with the desk clerk. The clerk informed the agents that only three units were occupied at the time. Unit 25 was checked out to one Ian MacCormick, and Unit 23 was occupied by an Argentinian couple. The third guest at the lodge was a long-term resident and was soon eliminated as a suspect. The clerk did not recognize any of the photos of Reilly presented by the agents. Agents also spoke to the Argentinian couple, and they too could not identify Reilly from the pictures, although the officers noted that the couple did not speak fluent English.

When they returned to Unit 25, a red Volkswagen Cabriolet with an identical vehicle identification number to one previously reported stolen was parked outside. The agents resumed surveillance outside an open window of the unit. The agents could not see through every window in Unit 25; through an open window, however, the agents observed a man reading and they heard a female voice. The agents could not positively identify the man in Unit 25 as Reilly, but the height, weight, facial shape and appearance of the man was similar to that of Reilly.

A woman later identified as Doris Lange eventually emerged from Unit 25, and Agent Kelly immediately began questioning her. She claimed ownership of the Cabriolet and was thereafter arrested. While being led to a police car by Agent Edwards, however, Lange broke away and yelled, "Run, Buddy!"[2] Lange was apprehended by a Sedona policewoman shortly thereafter. Agent Kelly later testified that, at that time, he had no idea who "Buddy" was. He also testified that anyone in the unit could easily have heard Lange's cries, as "[i]t was very quiet around that residence." Agent Edwards similarly testified.

Upon hearing Lange's cry, Agent Kelly quickly approached the front door of Unit

2. The record is unclear a to whether Lange exclaimed "Run, Buddy!", "Run, Buddy, Run!", or "Buddy, Run!"

25 and kicked it in. He observed Reilly sitting on the couch and ordered him to lay face-down on the floor, which Reilly did. Agent Edwards and Agent Manuel Johnson followed inside the unit, along with two United States Marshals. Agent Johnson ordered Reilly to spread his arms out on the ground, and Reilly complied with the instruction. Agent Kelly was armed with a shotgun, Agent Johnson had a handgun, and Agent Edwards held a submachine gun. All three had their weapons pointed at Reilly. The agents still could not account for the couple Reilly and Lange were supposed to meet at the lodge.

As Agent Johnson approached Reilly to handcuff him, Reilly began to bring his arms to his front waistband, and the agents told him to reposition his arms, which he did. Agent Edwards later testified that his experience as a federal agent taught him that the front waistband is a place people keep weapons. Agent Johnson then asked Reilly, "Where is the gun?" to which Reilly responded that it was in a black bag in the bedroom. At this point, Reilly had received no *Miranda* warning. Agent Kelly and a Sedona police officer immediately entered the bedroom, where the officer located a black leather briefcase in which there was a large amount of money, but no gun. Agent Kelly eventually found the gun in a black bag on the night stand. The search was then temporarily suspended.

Officers escorted Reilly to a waiting squad car, where Agent Edwards asked him his name. Reilly gave his first name as "Buddy," but before giving his last name, he asked either "Well, aren't I allowed to see a lawyer?" or "You will have to ask my lawyer." Later, Agent Edwards approached the patrol car with an FBI flyer that described tattoos on the suspect's arms. When Agent Edwards requested Reilly roll up his sleeve, Reilly admitted, "It's me. It's me." He then stated his true name as being Francis Joseph Reilly. Agent Edwards thereafter asked for and Reilly gave verbal consent to search Unit 25; however, the search did not commence until Reilly signed a written consent form at the station. During the search, officers collected numerous pieces of evidence.[3] Reilly was never Mirandized.

Prior to trial, Reilly moved to suppress the physical evidence seized during the search, as well as statements made by him during the course of the arrest. The district court denied the motion. The court excused the officers' noncompliance with the knock and announce requirement, explaining that it was reasonable for the police to suspect that compliance was dangerous under the circumstances. As for the failure to give a *Miranda* warning before inquiring into the location of the gun, the district court found that nothing in the record suggests that the agents were attempting to gain evidence or elicit an admission. Rather, the court felt the agents were simply concerned with their own safety, and the failure to provide Reilly with a *Miranda* warning was, therefore, excusable under the public safety doctrine. Finally, the district court admitted that the officers' questioning probably should have terminated after Reilly asked for an attorney. The court nonetheless admitted the evidence under the inevitable discovery doctrine, reasoning that the agents would have secured a search warrant had Reilly refused consent. Reilly was tried and convicted one and a half months later.

**3.** Reilly's brief lists all the physical evidence collected against him as a result of the allegedly illegal search. It includes: a wallet and the personal items inside it; a British Columbia drivers license in the name of Ian McCormick; a business card from Armored Mini Storage; a Canadian government card in the name of Ian MacCormick with a photograph; employee identification in the name of Ian MacCormick with a photograph; $680; a .380 semi-automatic pistol; a black money bag similar to a blue bag used in a previous bank robbery; shirt ties; a photograph of the interior of the closet in Unit 25 depicting white short sleeved men's dress shirts; a manila envelope containing 200 one dollar bills in $25 bundles; two receipts for cash rent payments at the lodge; the black briefcase found in the closet; and a lease agreement dated 4/8/98 in the name of Ian MacCormick.

## II. Discussion

### A. Knock and Announce

 18 U.S.C. § 3109 provides that an officer may forcibly enter a premises to execute a search warrant only after knocking and announcing his or her authority and purpose. Section 3109 codifies the knock and announce requirement necessitated by the Fourth Amendment. *See Wilson v. Arkansas,* 514 U.S. 927, 929, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). An officer's noncompliance with the knock and announce rule is excused, however, if exigent circumstances exist. *See United States v. Hudson,* 100 F.3d 1409, 1417 (9th Cir.1996). The determination of exigent circumstances is a mixed question of law and fact that we review de novo. *See id.*

 Exigent circumstances are "circumstances that would cause a reasonable person to believe that entry was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* (quotation omitted). Thus, a "no-knock" entry is constitutionally permissible when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime...." *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). *See also United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). The requisite exigency must consist of more than a generalized and nonspecific fear. *See United States v. Perez,* 67 F.3d 1371, 1383 (9th Cir.1995), *rev'd in part on other grounds,* 116 F.3d 840 (1997) (en banc).

 Reilly argues that exigent circumstances were not present because the agents acted on nothing more than a generalized fear. We disagree. In *Perez,* this court upheld officers' failure to knock and announce before entering the residence of a suspected drug dealer, stating that it was reasonable for the officers to believe themselves in a dangerous situation given the suspect's violent criminal history and the likelihood that he was armed. *See id.* at 1384. This court further explained that it was likely the suspect heard a noisy scuffle occurring outside the residence between officers and a houseguest, and this could have alerted him to the officers' presence and allowed him to dispose of evidence or arm himself. *See id.* Hence, the officers acted reasonably in foregoing the knock and announce requirement.

Similarly, Agents Kelly and Edwards were informed by agents in Pittsburgh that Reilly was wanted for numerous violent offenses, all of which involved the use of guns. The officers reasonably suspected that dangerous weapons might be on the premises. Furthermore, Lange's unexpected and vocal reaction to being taken into custody could have tipped Reilly off to the agents' presence and given him adequate time to arm himself or attempt to escape. Thus, we hold exigent circumstances permitted the agents to forego the traditional knock and announce rule.

The fact that the officers did not have specific information that Reilly indeed had firearms or other weapons in his possession is not determinative. This court in *United States v. Turner,* 926 F.2d 883, 887 (9th Cir.1991), excused an instance of noncompliance with the knock and announce rule, noting that "[the officers] may not have had specific information that [the defendant] currently had weapons, but the facts they did have made this highly likely." This is equally applicable to the case at bar.

 Moreover, we reject Reilly's contention that excusing the agents' failure to knock and announce creates a blanket exception in all cases where the pursued individual is suspected of a crime involving a weapon. The Supreme Court expressly forbade such all-encompassing exceptions to the knock and announce requirement in *Richards,* 520 U.S. at 394, 117 S.Ct. 1416, where it rejected the contention that police

officers never need to knock and announce before executing a search warrant in a felony drug investigation. The Court explained that the Fourth Amendment does not permit a blanket exception for an entire category of criminal activity. We do not dispute the validity of this principle; however, we find it does not apply here, as our holding is based on more than a simple consideration of the *modus operandi* of Reilly's alleged crimes. Reilly's propensity for violence and Lange's outburst are also relevant factors in our analysis. We have reviewed the specific circumstances surrounding the forcible entry into Unit 25, and we hold that the whole of the evidence supports the decision not to knock and announce.

### B. *Public Safety Exception*

Upon entering the unit, the FBI agents, accompanied by police officers, placed Reilly under arrest and ordered him from his seat on the couch to the floor. Reilly was surrounded by the officers, at least three of whom had their loaded weapons trained on him, but he was not yet handcuffed and his arms were spread out to each side. Reilly, while in this position face-down on the floor, began to bring his hands down to his front waistband. The agents saw this movement and were uncomfortable with it, as weapons are frequently concealed in the waistband. The agents had no idea whether Reilly was armed, but they were well aware of Reilly's use of weapons in past bank robberies. After ordering Reilly to reposition his hands, Agent Johnson asked Reilly "Where is the gun?" Reilly disclosed that the gun was in the bedroom in a black bag. The gun was thereafter recovered and placed into evidence.

▪ Reilly moved to suppress the evidence of the gun because Agent Johnson failed to give Reilly a *Miranda* warning before inquiring as to its whereabouts. The district court rejected the motion based on the public safety exception as articulated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Under *Quarles*, an officer's ques-

tioning of a suspect before giving a *Miranda* warning is acceptable if it "relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. 2626. The officer's subjective motivation in posing the question is not part of the analysis. *See United States v. Brady*, 819 F.2d 884, 888 n. 3 (9th Cir.1987). The application of the public safety exception is a mixed question of law and fact subject to de novo review. *See id.* at 886.

In *United States v. Carrillo*, 16 F.3d 1046 (9th Cir.1994), this court found no error when, before giving a *Miranda* warning, an officer asked a suspect prior to frisking him whether he had any drugs or needles on his person. This court explained that the exception was properly applied because there existed an objectively reasonable need for the officer to protect himself from potential bodily harm. *See id.* at 1049. Likewise, in *Brady*, this court applied the public safety exception to an officer's inquiry regarding the presence of a gun in the suspect's car. The officer and suspect were in a rough neighborhood at dusk, a crowd was gathering around them, and the suspect's car stood with its door open and the keys in the ignition. This court found that the officer's question, in light of the circumstances, was not designed to elicit testimonial evidence but rather was asked only to "neutralize this danger." *Brady*, 819 F.2d at 888.

Although *Carrillo* and *Brady* are factually distinguishable from the present situation, the circumstances of this case show that the public safety exception is nonetheless applicable. Agent Johnson's question "Where is the gun?" was not investigatory in nature and was sufficiently limited in scope to allow the officers to quell the volatile situation they faced. Admittedly, the factual circumstances faced by the agents were of a different character than those presented in *Brady* and *Carrillo*; however, the danger and instability of the

situation were just as valid, thereby excusing the pre-*Miranda* questioning.

Agent Johnson's inquiry bears no indication of an attempt to elicit testimonial evidence. In asking "Where is the gun?" Agent Johnson sought only to protect himself and his fellow officers. At the time of questioning, Unit 25 had not been secured. The couch on which Reilly was seated had not been searched, and a gun could have been hidden nearby. Moreover, Reilly was surrounded by officers with loaded weapons pointed at him, he was not yet handcuffed and still had the capacity to reach and grab any nearby objects. Factors such as these are relevant when deciding whether to apply the public safety doctrine. *See United States v. Creech*, 52 F.Supp.2d 1221 (D.Kan.1998), *aff'd*, 221 F.3d 1353 (10th Cir.2000); *United States v. Colon Osorio*, 877 F.Supp. 771, 776 (D.P.R. 1994). Further, Agent Johnson asked the question only after Reilly started to bring his hands to his waistband, a place where weapons are frequently concealed. The officers had no idea whether Reilly was armed or not, and this suspicious move reasonably caused Agent Johnson to fear that Reilly might be reaching for a weapon.

■ Agent Johnson did not ask his question in an attempt to link Reilly to the bank robberies. His inquiry was narrow, asking only a single question directed at determining the presence of the gun. As was noted earlier, Reilly was a suspect in several armed robberies and a violent armed carjacking. However, the relationship between the alleged criminal activity and the subject matter of the inquiry does not necessitate a finding that Johnson's question was investigatory and, thus, barred. *See Carrillo*, 16 F.3d at 1049 (upholding officer's questioning of suspected drug dealer regarding whether he had any drugs on his person); *United States v. Shea*, 150 F.3d 44, 48 (1st Cir.1998) (upholding questioning of suspected armed bank robbery co-conspirator regarding whether he had any weapons); *Fleming v. Collins*, 954 F.2d 1109, 1111, 1114 (5th Cir.1992) (en banc) (upholding questioning of suspected armed bank robber regarding whether he had any weapons); *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir.1989) (upholding questioning of suspected drug dealer regarding existence of weapons because "drug dealers are known to arm themselves"). While it is true that, unlike the situation in *Carrillo*, the question posed to Reilly called for more than a simple "yes" or "no" answer, Agent Johnson asked only the bare minimum necessary to locate and contain a potential threat. His question was not a subterfuge for collecting evidence, and it was not investigatory.

■ Our decision is not altered by the fact that at least three officers had their weapons drawn at the time of questioning. The officer in *Brady* drew his gun before posing his question, as did the officer in *Fleming*. It is a difficult exercise at best to predict a criminal suspect's next move, and it is both naive and dangerous to assume that a suspect will not act out desperately despite the fact that he faces the barrel of a gun. The officers' actions must be analyzed according to demands of the moment rather than hindsight analysis. To refuse to apply the public safety exception simply because an officer wields his weapon defensively is to both overestimate the compliance of some suspects and deny the doctrine its full and intended application.

"The *Quarles* exception rests on the ease with which police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Brady*, 819 F.2d at 887–88 (quotation omitted). Given the circumstances of this case, the question "Where is the gun?" falls more cleanly into the former category of questions. There was an objectively reasonable need on the part of the officers to protect themselves given the volatility of the situation with which they were faced. Thus, the

testimonial and physical evidence gained as a result of Reilly's response should not be suppressed.

## C. *Inevitable Discovery*

Once an accused in custody has requested the assistance of an attorney, officers must terminate all interrogation until counsel is made available or the accused voluntarily reinitiates communication. *See Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Continued questioning after the accused has requested counsel violates the accused's constitutional rights, and any evidence secured as a result of the unlawful questioning should be suppressed as the fruit of the illegal activity, otherwise known as the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 484–85, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also Nix v. Williams,* 467 U.S. 431, 441–42, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1395 (9th Cir.1989).

The inevitable discovery doctrine acts as an exception to the exclusionary rule, however, and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police...." *Nix,* 467 U.S. at 447, 104 S.Ct. 2501. The government must make this showing by a preponderance of the evidence. *See id.* at 444, 104 S.Ct. 2501. We review the district court's application of the inevitable discovery doctrine for clear error because, although it is a mixed question of law and fact, it is essentially a factual inquiry. *See United States v. Lang,* 149 F.3d 1044, 1047 (9th Cir.1998).

In its rejection of Reilly's motion to suppress, the district court rightfully admitted that it "really [did] not understand how it was then that an officer could believe that he could ask [Reilly] for an oral [consent to] search" after Reilly had arguably requested the presence of an attorney. Nonetheless, the district court admitted the evidence collected pursuant to Reilly's consent to search, stating:

> I think that it is clear here that the FBI, following routine procedures, if he had declined the oral consent, or the written consent, would have gone and gotten a search warrant. The facility was such that it could have been secured, individuals kept out, and that whatever was there would have been discovered.

We agree that the continued questioning of Reilly after he requested counsel violated Reilly's constitutional rights. We refuse to apply the inevitable discovery doctrine, however, to excuse the officers' misconduct.

It is true that the government can meet its burden by showing that the evidence would have been uncovered by officers in carrying out routine procedures. *See Ramirez–Sandoval,* 872 F.2d at 1399. For example, in *United States v. Martinez–Gallegos,* 807 F.2d 868 (9th Cir.1987) (per curiam), the defendant was incarcerated following a traffic violation after he failed to produce proof of insurance, registration or identification of any kind. When asked if he was a United States citizen, the defendant responded that he was not. INS agents were notified, and without giving the defendant a *Miranda* warning, the agents asked him for his name and background information, which he gave them. The agents then consulted his "A" file and determined that the defendant had been deported two times. The defendant sought to suppress the contents of his "A" file as the illegal fruit of his statements to the agents. The court denied the motion on the basis that, had the defendant refused to answer their questions, the next and only step available to the agents was to consult the "A" file. *See id.* at 870. Thus, the evidence contained within would have been inevitably discovered. Similarly, in *United States v. Andrade,* 784 F.2d 1431 (9th Cir.1986), this court excused the illegal search of the defendant's garment

bag because the defendant's processing at the DEA's holding facility was inevitable, and as a matter of routine procedure, all his belongings, including the garment bag, would have been searched. Thus, the discovery of the drugs in the bag was inevitable.

 This reasoning does not extend, however, to the federal agents' unexplained failure to secure a search warrant. As this court noted in *United States v. Echegoyen,* 799 F.2d 1271, 1280 n. 7 (9th Cir.1986), "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." This contention has been echoed with approval in *United States v. Boatwright,* 822 F.2d 862 (9th Cir.1987), and *United States v. Mejia,* 69 F.3d 309 (9th Cir.1995). As this court explained in *Mejia,* it "has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant." 69 F.3d at 320. Hence, the district court committed clear error in applying the inevitable discovery doctrine based on the agents' actual but unexercised opportunity to secure a search warrant.

 The inevitable discovery doctrine applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself. *See Boatwright,* 822 F.2d at 864–65. In the case at bar, nothing outside that which occurred during the improper search supports the discovery of the challenged evidence. Thus, we reverse the district court's application of the doctrine to these facts.

### III. Conclusion

Because sufficiently exigent circumstances existed to excuse the officers' failure to knock and announce, we affirm the district court on this issue. Similarly, because we find the officers had an objectively reasonable suspicion that their safety was threatened, we affirm the district court's application of the public safety exception and the admissibility of Reilly's statement and his weapon into evidence. We find clear error, however, in the district court's application of the inevitable discovery doctrine to the agents' failure to secure a search warrant; thus, we reverse on this issue and remand to the district court for a new trial consistent with this opinion.

Judgment REVERSED and REMANDED for a new trial.