**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Anthony BARONI, Defendant–
Appellant.**

**No. 00–10388.**

**D.C. No. CR–99–20088–JF.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 17, 2001.

Decided July 6, 2001.

Before SNEED and SILVERMAN, Circuit Judges, and LASNIK,* District Judge.

## MEMORANDUM **

On June 2, 1999, the government filed a multi-defendant indictment charging James Anthony Baroni with being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). Following a three day hearing, the District Court for the Northern District of California granted in part and denied in part Baroni's motion to suppress evidence. Baroni thereafter entered a conditional guilty plea, expressly preserving his right to appeal the denial of his motion to suppress.

On July 14, 2000, Baroni timely filed a notice of appeal, challenging the district court's denial of his motion to suppress and the constitutionality of the "felon-in-possession" statute, 18 U.S.C. § 922(g)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS

At approximately 10:45 a.m. on the morning of March 18, 1999, nine members of the Santa Cruz County Sheriff's Office Marijuana Enforcement Team executed a

---

* Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by 9th Cir. R. 36–3.

search warrant at 23430 Glenwood Drive, Los Gatos, California. The search warrant authorized the officers to search specific structures on the property, namely the residence of Richard Zamora and an adjacent garage. Led by Detective Daniel Campos, the officers entered Zamora's residence, placed him in handcuffs, and located a small amount of methamphetamine and marijuana, some marijuana seeds, and a scale. The officers then searched the adjacent garage and discovered that it was the residence of appellant's brother, David Baroni. They found several rifles and some marijuana leaves in David Baroni's residence. As acknowledged by Detective Campos, at that point the objective of the search warrant had been accomplished. Nevertheless, the officers, all of whom were armed, spread out across the property in an effort to contact the other residents of the property and question them about Zamora.

Detective Campos, accompanied by two other officers, was walking up the driveway toward another structure when he encountered Jayleen Elliott, James Baroni's girlfriend. Detective Campos told Elliott that the officers were investigating Zamora and asked if she knew where he lived Elliott responded that she believed Zamora lived on the property, but referred the officers to Baroni for additional information. Elliott testified that Detective Campos asked for permission to search Baroni's house, but that she refused. At Detective Campos' request, Elliott summoned Baroni to the door of their residence. When Baroni appeared, Detective Campos was standing on the doorstep. The two other officers were standing at the bottom of the steps. One was armed with a submachine gun. After asking a

few questions regarding Zamora, Detective Campos asked Baroni if he would permit the officers to search his residence. Baroni refused. At that point, Detective Campos asked or told Baroni to come out and join the officers.*** Detective Campos acknowledged that, at the time Baroni was called to his door and stepped out of his house, he had no information that Baroni was involved in any criminal activity.

Shortly after Baroni exited his residence, Detective Sergeant James Hart and Deputy Sheriff Derek Fenster approached the group. Sergeant Hart asked to speak with Detective Campos privately and informed him of discoveries they had made in other areas of the property. Sergeant Hart reported that he and Officer Fenster had walked to another residence on the property. There Detective Hart detected the odor of marijuana near the front door and near an air conditioning unit on the side of the house. Sergeant Hart reported that he and Officer Fenster had also approached a shed on the property in which they had seen marijuana plants through a gap in the doors. The officers saw that the shed had water and electric lines running from the shed toward "the general area" of the Baroni residence.

Detective Campos left the Baroni residence to confirm Sergeant Hart's findings. Officer Fenster, meanwhile, had joined Baroni and Elliott. He asked Baroni if he were on parole or probation or if he had ever been arrested. Baroni responded that "he had discharged parole about a year and a half earlier where he had done a sixteen-month sentence but was no longer on parole." Officer Fenster asked Baroni where he had served his time and

*** The officers testified at the suppression hearing that Baroni was generally cooperative during this encounter and voluntarily complied when Detective Campos asked him to come down. Baroni, on the other hand, testified that he felt he had no choice but to exit his residence and did not feel that he could tell the officers to go away.

whether his conviction was for a drug-related offense.

At this point, the testimony of Baroni and Elliott differs from that of the officers, with neither version being entirely consistent with the documentary evidence. According to the officers, while Detective Campos was checking out other areas of the property and while Baroni and Elliott were still together on a bench outside their residence, Baroni asked for permission to go inside to get some cigarettes. Officer Fenster told Baroni that he was not allowed to go into his house unescorted, but that if Baroni agreed to allow an officer to go with him, he could retrieve the desired items. Baroni agreed and Officer Fenster followed him into the house. As the two men were entering the building, Officer Fenster had his hand on his holstered gun and asked Baroni if there were any weapons in the house. Baroni disclosed that there were two handguns under the nightstand and was instructed to stay away from that area. Baroni did so, retrieved the cigarettes and a blanket, and went back outside.

In the officers' version of events, approximately four or five minutes had passed since the time Detective Campos had left to investigate the other areas of the property. When he returned, Detective Campos took Officer Fenster aside and told him that he was going to seek a second search warrant. Officer Fenster, in turn, reported that Baroni had served a prison term and had two handguns inside his house. Detective Campos said he would include that information in his search warrant affidavit and seek authorization to search Baroni's residence. Detective Campos left the property almost immediately thereafter, and Officer Fenster went to inform Sergeant Hart of Detective Campos' activities. Officer Fenster then went back to speak with Baroni, who was standing with Elliott and some officers

near a bench. Officer Fenster informed Baroni that Detective Campos was going to seek a second search warrant and that the residences were "frozen." Officer Fenster said that he "was uncomfortable with two unsecured handguns in the residence" and asked Baroni "if it would be okay if I collected those weapons and placed them in my car for safekeeping." Baroni is reported to have replied "Sure. I'll even go in there with you and show you where they are." When Baroni, Officer Fenster, and Officer Dodd entered the residence, Baroni pointed to the nightstand and said that the two handguns were underneath it and, further, that there was a shotgun between the mattress and the box spring of the bed. The weapons were removed from the residence and placed in Officer Fenster car.

In Officer Fenster's estimation, approximately twenty minutes had passed between his initial encounter with Baroni (which was a few minutes after Detective Campos had initiated the contact) and the time the weapons were seized. During that period of time, Baroni and Elliot had been permitted to remain together. After the weapons were secured, which took another five minutes or so, Officer Fenster separated Baroni and Elliott in order to "speak to [them] with regards to the weapons." All subsequent statements were suppressed by the district court as a violation of Baroni's *Miranda* rights.

According to Baroni and Elliott, on the other hand, Elliott was taken to a retaining wall and separated from Baroni approximately ten to twenty minutes after their encounter with the officers began. Detective Campos had already left the premises at that point in time and the residences had been "frozen." In this version of events, Baroni's inculpatory statements regarding the presence of firearms and his re-entry into the house followed

the freezing of the property and his separation from Elliott. The district court, after observing the witnesses and considering the conflicting testimony, found the officers more credible than Baroni and Elliott and concluded that Baroni and Elliott had not yet been separated when Baroni revealed the presence of firearms in the house.

## STANDARD OF REVIEW

The appeal raises a number of issues regarding the lawfulness of the officers' conduct in approaching and questioning Baroni and in searching his residence. Whether an encounter between the police and a citizen constitutes a seizure or detention under the Fourth Amendment is a mixed question of law and fact. The district court's underlying factual findings are reviewed for clear error (*United States v. Cormier*, 220 F.3d 1103, 1110 (9th Cir. 2000), *cert. denied*, 531 U.S. 1174, 121 S.Ct. 1146, 148 L.Ed.2d 1009 (2001)), but a district court's decision that no Fourth Amendment seizure occurred or that a particular set of facts constituted reasonable suspicion are reviewed *de novo* (*United States v. Ricardo D.*, 912 F.2d 337, 339 (9th Cir.1990); *United States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir.1987)). Whether the public safety exception to *Miranda* applies in particular circumstances is a mixed question of law and fact and is subject to *de novo* review. *United States v. Reilly*, 224 F.3d 986, 992 (9th Cir.2000). Finally, a district court's finding regarding the voluntariness of defendant's consent to search is reviewed for clear error. *Cormier*, 220 F.3d at 1112.

## DISCUSSION

## I. MOTION TO SUPPRESS

Baroni claims that the district court erred in denying his motion to suppress (a) statements regarding his prior convictions and the presence of firearms and (b) evidence seized from his residence. A searching review of each step of the officers' encounter with Baroni reveals no constitutional violations and no reversible error on the part of the district court.

### 1. Initial Police Contact

Law enforcement officers have the liberty, in common with other citizens, "to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away." *Terry v. Ohio*, 392 U.S. 1, 32–33, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring). Such an interrogation turns into a seizure under the Fourth Amendment when, "taking into account all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" or that he "was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 437, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (internal quotations and citations omitted). The circumstances surrounding the encounter should be considered "from the perspective of the person seized." *Allen v. Portland*, 73 F.3d 232, 235 (9th Cir.1995) (quoting *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295 (9th Cir.1988)).

The Ninth Circuit has identified a number of factors to be taken into consideration when determining how a reasonable person would have reacted to a particular set of circumstances. In *Orhorhaghe v. Immigration and Naturalization Service*, 38 F.3d 488, 494–96 (9th Cir.1994), and *Cormier*, 220 F.3d at 1110–11, the Court addressed the following factors: (1) whether the officers created a threatening presence; (2) whether the officers revealed that they were carrying weapons; (3) the

setting of the encounter; (4) whether the officers used physical force or the authority of their office to indicate that the citizen was not free to leave; and (5) whether the officers advised the citizen that he could terminate the encounter. The district court did not individually consider these factors when determining that the initial encounter between Baroni and Detective Campos did not constitute a Fourth Amendment seizure. Nevertheless, the court's conclusion was correct. The officers did not compel Baroni to come to his door with a claim of authority, use physical force to initiate their investigation, or otherwise limit Baroni's course of action. The number of officers, the presence of weapons, and the setting of the encounter were reasonable and consistent with the officers' explanation that they were executing a search warrant and investigating Zamora and his activities. In short, from Baroni's perspective, Detective Campos wanted to ask him questions and investigate alleged illegal activities on the property. While it may be annoying to be roused from the comfort of your home to answer the door and respond to the visitors, a reasonable person would have felt free to decline to answer the questions (just as Baroni declined to permit Detective Campos to search his residence). The initial police contact with Baroni was, therefore, lawful.

(2) Statements Regarding Prior Convictions and Possession of Firearms

■ Under the same factors identified above, Baroni's encounter with the officers ripened into a seizure when he was refused re-entry into his house. Up until that time, a reasonable person would have felt free to leave. The officers, as a group, were obviously investigating other portions of the property, with individual officers coming and going as the investigation proceeded. Although Officer Fenster was concerned about the source of the water and electric lines running toward the shed,

Baroni had no reason to believe that his residence had come under suspicion or that he could not simply tell the officers he had no other information about Zamora and end the questioning. This state of affairs lasted through the first few minutes of questioning by Detective Campos and Office Fenster and included the conversation regarding Baroni's parole history.

■ At some point thereafter, however, Officer Fenster's subjective intent to hold Baroni for questioning was clearly communicated to Baroni, such that a reasonable person in his shoes would not have felt free to terminate the encounter: the focus of the questioning turned to Baroni and his activities, the officers had moved Baroni and Elliott away from the door of their residence and seated them on a bench, the totality of the circumstances accurately reflected Officer Fenster's intent to detain Baroni, and, not surprisingly, Baroni was never told or given the impression that he, at this point in the conversation, could ignore the police presence and leave. As all witnesses testified, Baroni felt compelled to ask for permission to return to his house. According to the officers, Baroni believed himself to be innocent of any wrongdoing at that point, so his subjective perception that he was not free to go into his house is at the very least evidence that "a reasonable innocent person in these circumstances would not have felt free to leave after brief questioning." *Delgadillo–Velasquez*, 856 F.2d at 1295–96. At the latest, then, Baroni was seized the first time he was told he could not go inside or that he could do so only if he agreed to take an officer with him. His liberty, at that point, was curtailed by the officers and he was not free to retreat to his home or even to escape their presence for a short period of time. In such circumstances, Baroni was seized within the meaning of the Fourth Amendment prior

to the time he made the statements regarding the presence of firearms.****

■ Baroni argues that any statements made after he was seized should have been suppressed because they were made in response to questions posed without providing the required *Miranda* warnings. Appellees, on the other hand, argue that the questions were justified by the officer safety exception to *Miranda*, which applies where the questions "relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon." *Reilly*, 224 F.3d at 992 (quoting *New York v. Quarles*, 467 U.S. 649, 659 n. 8, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)). Although Officer Fenster would have had no reason to ask Baroni about the presence of firearms had Baroni remained outside, his oft-stated desire to re-enter his house gave rise to a situation in which it was eminently reasonable for the officer to attempt, in as unobtrusive a way as possible, to make sure that such re-entry would not pose a significant danger to the officers on site. By insisting on being allowed back into his house, Baroni introduced an unknown level of risk which Officer Fenster was attempting to alleviate or at least quantify: in short, he acted reasonably in the circumstances to promote officer safety. Thus, despite the fact that Baroni was within the control of the officers, Officer Fenster's questions regarding the presence and location of firearms in the house were justified under the officer safety exception to *Miranda*.

### (3) Voluntary Consent

■ A district court's determination that a person's consent to search was voluntary will not be overturned unless it is clearly erroneous. *United States v. Koshnevis*, 979 F.2d 691, 694 (9th Cir.1992). In this case, the district court's analysis dealt only with the statements made by Baroni and did not specifically address the appropriateness of Officer Fenster's search of his residence. It must be assumed, however, that the district court believed that Baroni had voluntarily consented to Officer Fenster's entries into his residence. Although that determination was necessarily influenced by the district court's erroneous legal conclusion that no unlawful seizure had occurred at that time, the finding was not clearly erroneous.

■ In order to establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given. *United States v. Chan–Jimenez*, 125 F.3d 1324, 1327 (9th Cir.1997). Factors to be considered when assessing the totality of the circumstances include: (1) was the person in custody; (2) had the officer drawn his weapon; (3) did the officer administer *Miranda* warnings; (4) did the officer inform the person of his right to refuse consent; and (5) was the person

---

**** The district court agreed that, at some point after the initial contact began and before Baroni was permitted to re-enter his house, Baroni was seized. Nevertheless, the district court concluded that the seizure was lawful, presumably on the grounds that, based on an assessment of all the circumstances, the officers had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It is undisputed that the officers did not have a reasonable suspi-

cion that Baroni was engaged in criminal activity when they initiated contact at the door of the residence. After Officer Fenster arrived, however, he felt Baroni should be detained in order to investigate Baroni's connection, if any, to the marijuana plants in the shed. Even if Officer Fenster's suspicions could be considered reasonable, the seizure was unlawful because Officer Fenster failed to take any steps to confirm or dispel his suspicions in a timely fashion. *See Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320–21 (9th Cir.1995).

told that a search warrant could be obtained? *Id.* Although the record contains facts from which one could infer that Baroni gave Officer Fenster permission to enter his house under some duress (*i.e.,* Baroni had been seized and had not received *Miranda* warnings), it is clear that the choice between remaining outside and entering the house with a police escort was his to make and that he knowingly opted for the latter. In addition, having heard the testimony and observed the demeanor of the participants, the district court apparently concluded that Baroni's after-the-fact protestations of duress were less believable than the officers' observations the Baroni was calm, cooperative, and helpful during this portion of the encounter.*****

 In the circumstances of this case, Baroni's permission for Officer Fenster to accompany him into his house was freely given. By the time the officer sought consent to collect the weapons from Baroni's house, he had probable cause to believe that Baroni had committed a crime. In addition, Baroni was, by all accounts, resigned to the seizure of the weapons and therefore voluntarily consented to their collection.

## II. CONSTITUTIONALITY OF THE FELON–IN–POSSESSION STATUTE

 The Court generally reviews a challenge to the constitutionality of a statute *de novo. United States v. Mack,* 164 F.3d 467, 471 (9th Cir.1999). This panel is not at liberty, however, to overturn existing Ninth Circuit precedent. *Murray v. Cable Nat'l Broadcasting Co.,* 86 F.3d 858, 860 (9th Cir.1996), cert. denied, 519 U.S. 1058, 117 S.Ct. 689, 136 L.Ed.2d 613 (1997). The Ninth Circuit has already decided that the felon-in-possession statute, 18 U.S.C. § 922(g), is a permissible extension of Congress' Commerce Clause authority. *United States v. Jones,* 231 F.3d 508 (9th Cir.2000). This panel is bound by that decision.

### CONCLUSION

We affirm the district court's denial of Baroni's motion to suppress. His statements regarding his parole history were voluntarily made when Baroni was still free to ignore the police presence and walk away. The officer's questions regarding the presence of firearms were reasonable attempts to protect the officers on-site: thus, despite the fact that Baroni had been seized and had not been apprized of his *Miranda* rights, his incriminating responses need not be suppressed. The district court's refusal to suppress the weapons that were removed from Baroni's residence was justified by his voluntary consent to the officers' entry and search. Finally, Baroni's challenge to the constitutionality of 18 U.S.C. § 922(g) fails in light of the binding precedent from this Circuit.

AFFIRMED.

---

***** The officers' testimony regarding Baroni's state-of-mind is bolstered by the fact that Baroni apparently did not realize that the mere presence of firearms in his house was a crime, even in the absence of proof of ownership or evidence of actual use.