

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2009

# USA v. Duncan

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-1086

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Duncan" (2009). *2009 Decisions.* Paper 1969.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1969

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-1086
_____

UNITED STATES OF AMERICA

v.

EUGENE DUNCAN,
                                        Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 06-cr-00308)
District Judge: Honorable Stanley R. Chesler

_____

Argued February 1, 2008

Before:  RENDELL and CHAGARES, Circuit Judges,
and POLLAK, District Judge.*

Filed: January 30, 2009

_____

_____

    *  Honorable Louis H. Pollak, Senior Judge of the United States District Court for the
    Eastern District of Pennsylvania, sitting by designation.

Andrea D. Bergman, Esq.   **[ARGUED]**
Office of  Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ   08609-0000
  *Counsel for Appellant*
  *Eugene M. Duncan*

Eric H. Jaso, Esq.   **[ARGUED]**
George S. Leon e, Esq.
Office of United States Attorney
970 Broad Street, Room 700
Newark NJ   07102-0000
  *Counsel for Appellee*
  *United States of America*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

Eugene Duncan was convicted by a jury of being a felon in possession of a

firearm, in violation of 18 U.S.C. § 922(g).  Duncan argues that we should vacate his

conviction and remand for a new trial based on three alternate grounds.  First, he

complains of two evidentiary exclusions by the District Court.  Second, he maintains that

the District Court misapplied the "public safety" exception to *Miranda* when it refused to

suppress statements that he allegedly made to the arresting officers.  Third, Duncan

asserts that the Government committed prosecutorial misconduct during its summation by

commenting on his failure to introduce evidence that the District Court had excluded. We have considered all three grounds, and we will affirm.[1]

We recount the facts in some detail, as they are essential to our reasoning. On October 28, 2005, there was a shooting at the Kingsbury Apartment Complex in Trenton, New Jersey. It is undisputed that Duncan had nothing to do with it. Late the next night, Duncan was sitting in the driver's seat of a red car parked near the Complex when Detectives Astbury and Woodhead pulled up in an unmarked police car. Astbury and Woodhead were members of the Trenton Police Department's Tactical Anti-Crime Unit ("TAC"). Astbury and Woodhead both testified that they were in the neighborhood of the Kingsbury Apartment Complex investigating a drug tip that did not pan out. They explained that they then happened to see Duncan sitting in the driver's seat of a red car parked on a quiet street. They testified that they pulled up next to the car and then approached it on foot because Duncan was drinking a bottle of beer. According to the detectives, Astbury approached the driver's side, Woodhead approached the passenger's side, and Duncan was the only person in the car.

Astbury testified that when he shined a flashlight into the car, he saw Duncan attempting to hide the beer bottle on the floor with his left hand and "shoving" a "shiny silver object" into his right jacket pocket with his right hand. Based on his experience,

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

Astbury thought that the shiny silver object was a handgun. Astbury then asked Duncan for the beer and identification, intending to write him up for public drinking.

According to Astbury, the following sequence of events transpired next: Duncan got out of the car without having been asked to do so, appeared nervous, "made a quick movement towards his right pocket with his right hand, [and] began to bend down towards the roadway." (App. 126.) Astbury then grabbed Duncan's arms and held them on the roof of the car, but Duncan once more reached toward his right jacket pocket. Astbury again grabbed Duncan's arms, put them back on the roof of the car, and "conducted a quick pat-frisk" of the jacket pocket area. (App. 127.) He "felt a hard object that was similar in size and shape to a weapon [and] believed it to be a handgun." (App. 128.) Astbury then pulled Duncan's arms behind his back and, without advising him of his *Miranda* rights, asked him whether the object was a gun. Duncan answered, "[Y]es, but it's not mine." (App. 129.) At trial, Astbury gave the following explanation as to why he asked Duncan this question:

> Sometimes it's better on the street to know if you have a gun, if somebody who has a gun knows that the police know you have a gun or anything that they don't want the police to find, it makes the situation a little bit easier. If they think that they're still hiding it, they're still more nervous, as well as if I know it's a gun, I can go inside of his pocket more carefully and get it out rather than just going in there and not knowing what it is.

(App. 129-30.)

Both detectives testified that, at this point, Astbury called out to Woodhead the Trenton police codeword for gun – "301" – put Duncan in handcuffs, and removed a

4

silver handgun from Duncan's right jacket pocket. In addition, Astbury related that he called for backup after Duncan confirmed that the object in his pocket was a gun. According to Astbury, it took "less than two minutes" from the time that he and Woodhead first saw Duncan until the time they placed him under arrest. (App. 136.)

Woodhead told the Court that he then took Duncan to the rear of the police car and "conducted a secondary search" of Duncan's person. (App. 296.) According to Woodhead, neither of the detectives said anything during this search, but Duncan said again that the gun was not his and elaborated that he had a "story" and that he had "borrowed the jacket from someone on Monmouth Street." (App. 296-97.) According to Astbury, Duncan made these statements to Woodhead "[l]ess than three minutes" after he told Astbury that the object in his pocket was a gun. (App. 36.)

Duncan's mother, who lived at the Kingsbury Apartment Complex, testified that police in the neighborhood were "looking for a red [] car with a black man in it" in connection with the shooting from the previous night. (App. 357, 362-63.) Duncan's defense theory was that (1) an alert went out over Trenton police radio about the Kingsbury shooting, informing officers that an African-American man in a red car was a suspect; (2) as members of the TAC unit, Astbury and Woodhead heard the alert; and (3) the detectives fabricated the entire gun story as a pretext for bringing Duncan in for questioning about the shooting because he matched the suspect profile and because they saw a red scarf – typical attire for local gang members – in the back seat of the red car.

5

Duncan did not take the stand, but a friend, Joseph Myles, testified that he was in the front passenger's seat next to Duncan when the officers pulled up next to the red car and that it was he (not Duncan) who was drinking at the time. Myles explained that the officers did not immediately address him, even though he was the one with the beer; rather, one of the officers approached the car and asked Duncan about the red scarf that was in the back seat. According to Myles, Duncan responded that the scarf and the car were not his, after which the police ordered Duncan out of the car and frisked him. Myles stated that three officers then came to the passenger's side of the car, ordered him to step out, frisked him, and then told him that "you better go before you get locked up." (App. 403.) Myles's testimony indicated that there were at least five officers at the scene.

Myles told the Court that at no time that night did he see Duncan with a gun, let alone see him trying to hide one in his jacket pocket. In addition, Myles testified that, as far as he remembered, Duncan was not even wearing a jacket.

The first evidentiary ruling that Duncan challenges on appeal is the District Court's refusal to allow defense counsel to ask Detective Astbury whether anyone from the TAC unit had interviewed Duncan about the Kingsbury shooting at the station house after his arrest. The second evidentiary ruling that Duncan now challenges is the District Court's refusal to enforce a subpoena against a Trenton police officer who would have testified about sending the alleged alert about the Kingsbury shooting over Trenton police radio. Duncan urges that allowing these pieces of evidence would have made more

6

probable his defense theory that the weapons charge against Mr. Duncan was a pretext for questioning him about the Kingsbury shooting.

Taking the second exclusion first, we credit the District Court's view that the testimony would not have been relevant. The officer presumably would have testified that an alert went out, but this was not the issue. The issue was whether Astbury and Woodhead were aware of the shooting and, thus, may have been acting with the motive that Duncan suggested.

Similarly, as to the first exclusion, the relevance of the information sought to be elicited is dubious at best. The mere fact that Duncan was questioned at the station house about the Kingsbury shooting, without more, does not "hav[e] any tendency" to make it "more probable . . . than it would be without th[at] evidence" that the arresting officers at the scene knew about the shooting and were motivated by that knowledge to fabricate the story about the gun. *See* Fed. R. Evid. 401. Based on the record as it was developed before the District Court, Astbury and Woodhead's motivation and the actions of officers at the station house are two different things. Without some nexus between them, the argument that subsequent station house questioning bears on the detectives' motivation for arresting Duncan is no more than speculation.

Accordingly, we conclude that the District Court did not abuse its discretion in making either of these exclusionary rulings.

Before trial, Duncan moved to suppress the statements that he allegedly made to Detectives Astbury and Woodhead after Astbury had asked – without Duncan having been advised of his *Miranda* rights – whether the object in his jacket pocket was a gun. The Government conceded that this was a custodial situation, which ordinarily triggers *Miranda*'s requirements, but argued that Astbury's question fell under the "public safety" exception to *Miranda*. The District Court agreed and therefore refused to suppress Duncan's statements to Asbury.

While statements made by a defendant stemming from custodial interrogation are generally inadmissible at trial and presumed to have been compelled if the defendant was not previously advised of his *Miranda* rights, the Supreme Court, in *New York v. Quarles*, 467 U.S. 649, 655 (1984), established a "'public safety' exception" to *Miranda*. Under this narrow exception, the police do not need to give the *Miranda* warnings before asking a suspect questions that are necessary to protect the public or the police from immediate danger, *Quarles*, 467 U.S. at 656-59 & n.8. The exception applies when it would have been objectively reasonable for the officer to believe that asking the question was necessary to protect the public or police from immediate danger. *Id.* at 656, 659 n.8.[2]

The Government urges that the District Court correctly applied the public safety exception because, "with Duncan repeatedly reaching for his pocket despite Detective

_____

[2] We review for clear error factual findings underlying the denial of a motion to suppress a defendant's non-Mirandized statement and review *de novo* the application of the law to those findings. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

8

Astbury's commands to stay still and efforts to restrain his arms, it was important for the detectives, to ensure their personal safety and the safety of nearby residents, to immediately ascertain whether Duncan in fact had a gun on him." (Appellee's Br. 17.) In addition to Duncan's furtive, uncooperative behavior, the Government points to the rapidity with which the encounter transpired as support for the application of the exception. Further, it contends that Astbury's conduct immediately after Duncan answered his question – his use of a codeword to inform Woodhead about the gun and his decision to call for backup – demonstrate that Astbury had "an objectively reasonable safety concern in a volatile situation." (Appellee's Br. 17.) Duncan counters that the exception is a narrow one and that there was no necessity for the officer to inquire whether he had a gun.

The public safety exception requires examination of the "totality of the circumstances." *See United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (citing *United States v. Banks*, 540 U.S. 31, ---- (2003)); *United States v. DeSantis*, 870 F.2d 526, 541 (9th Cir. 1989). The dispositive question here is whether, considering all the circumstances, it was objectively reasonable for Detective Asbury to have thought that asking Duncan whether the object indeed was a gun was necessary to protect himself, his partner, or the public from immediate danger.[3] While this is a close case given the

---

[3] Judge Chagares writes separately, urging that three factors are useful in determining whether the public safety exception applies. He acknowledges, however, that these factors are not "the test." We do not join in his concurring opinion because we believe

9

narrowness of the exception, we conclude that we should answer in the affirmative in the fact pattern before us. Given Duncan's movement of his arms and reaching toward his pocket, and the perceived and obvious danger if the object was in fact a gun and were to go off, we find that the one question that was asked, clearly for reasons of safety, was permissible under the totality of the circumstances. Accordingly, the District Court properly refused to suppress Duncan's statement in response to the question.[4]

Duncan also urges on appeal that the prosecutor improperly argued in summation that there was no evidence to support the theory that Astbury or Woodhead had fabricated the story about the gun and had lied on the stand. The prosecutor urged that Duncan had failed to adduce any evidence that he had been questioned about the shooting, although she knew full well that the District Court had prevented him from pursuing this line of inquiry. We agree that this was unfair. The prosecutor's comments regarding the lack of

---

that his proposed distillation of the *Quarles* test is unnecessary, and we are concerned that it could be mistaken for a "test." This would be unfortunate because it misses the mark: the necessity, urgency, and immediacy mandated by *Quarles* get lost in the focus on three static aspects. It could also lead to an unwarranted expansion of this narrow exception to *Miranda*. The test under *Quarles*—whether police questioning is necessary to protect the public or police from an immediate danger—is straightforward, and entails a "snapshot" look at the situation facing an officer at a moment in time, under the totality of the circumstances. It needs no distillation. Moreover, the "snapshot" here satisfies the *Quarles* test, with the required necessity, urgency, and immediacy.

[4] The Court also held that Duncan's statements to Woodhead were admissible on a separate ground, finding that they were volunteered and thus beyond the ambit of *Miranda* altogether. Because we conclude that the public safety exception applied, we need not reach this alternate ground.

evidence supporting the alleged motive for Astbury and Woodhead to frame Duncan were improper. The main reason the jury was not presented with this evidence was that the Court had granted the *Government*'s earlier requests to exclude it. While the District Court probably should have taken action in response to Duncan's objection, we conclude that this was harmless error because the entire issue of whether Duncan had been questioned at the station house was, at best, of attenuated relevance to the officers' credibility, as we have discussed above, and, thus, to Duncan's defense.

Accordingly, we will AFFIRM the District Court's Judgment and Commitment Order.

_____

CHAGARES, Circuit Judge, concurring.

During a brief, fast-moving confrontation with an uncuffed, uncooperative, and possibly intoxicated Eugene Duncan, Trenton Detective Jason Astbury saw Duncan stuff a silver object into his jacket pocket. Astbury frisked the pocket and felt something hard and heavy. He then asked Duncan a single question – whether "it was a gun" in Duncan's pocket – without first reciting Miranda warnings. Joint Appendix (JA) 129. Duncan's answer established that indeed he had, hidden on his person, a .38 caliber five-shot revolver, fully loaded with hollow-point bullets. I believe Duncan's answer falls squarely within the narrow "public safety" exception to Miranda v. Arizona, 384 U.S. 436 (1966),

established by New York v. Quarles, 467 U.S. 649 (1984). Therefore, although I agree with my learned colleagues' conclusion that we should affirm the District Court's Judgment and Commitment Order, I write separately because I do not believe that the application of Quarles here presents a "close case."

I.

At approximately 11:00 p.m. on October 29, 2005, Detective Astbury and his partner, Detective Ryan Woodhead, of the Trenton Police Department's Anti-Crime Unit were patrolling the area of Ardmore and Farragut Avenues in an unmarked police car. The detectives knew from an informant that a drug dealer operated out of a house on Ardmore Avenue and also out of a brown Chevrolet Caprice that the dealer parked nearby. Driving up Ardmore Avenue, the detectives flipped on their car's spotlight to illuminate the suspected drug house. No one was visible. As they turned the corner onto Farragut Avenue, they spotted the brown Caprice. It was empty. The police car crawled past the Caprice and the spotlight shone on Duncan, sitting in the driver's seat of a red Chevrolet Beretta parked behind the Caprice. Duncan had a green glass bottle of Heineken beer raised to his lips.

When the light hit Duncan, he was "visibly startled. His eyes got big and he began to frantically move around inside the vehicle," reaching down "toward the floor board." JA 120, 123. Astbury stopped his car, intending to write Duncan a ticket for violating the Trenton ordinance against drinking alcohol in public. Astbury exited his vehicle and

12

walked toward Duncan. As he closed from seven feet to three feet from the Beretta, Astbury saw something more than a relatively innocuous green bottle in Duncan's hand: "[A]s I approached the car, I observed him with his right hand attempting to conceal a silver object in his right front [jacket] pocket." JA 30. As he fumbled with the object, Duncan "was still visibly nervous, moving around a lot inside the vehicle." JA 32.

Astbury believed – but "wasn't 100 percent sure" – that the silver object was a gun. JA 50. Duncan succeeded in both shoving the object into his jacket pocket and hiding the beer, and his hands were now empty and in a position where Astbury could see them. Astbury told Duncan to stop moving and "to hand the beer over to me, and he cracked the door and handed me the beer." JA 32. Astbury put the bottle on the Beretta's roof. He then asked Duncan for identification, but did not ask him to get out of the car. Duncan did not follow this direction. Instead, without prompting, Duncan "stepped out of the vehicle and turned his back away from" Astbury. Id. After this unprompted maneuver, Duncan, who appeared to be "still nervous," performed another unsettling act: he immediately "made a quick movement toward his right [jacket] pocket with his right hand [and] began to bend down towards the ground." JA 126. Thinking that Duncan was reaching for the silver object, Astbury instantly grabbed Duncan's arms and pulled them up onto the roof of the car. This did not end Duncan's resistance, however, for Duncan pulled his arm down and again "reached towards his right jacket pocket with his right hand. This time he did not bend down towards the roadway, though." JA 127. Again, to

13

stop Duncan from grabbing whatever was in that pocket, Astbury grabbed Duncan's arms and put them back on the roof of the car.

His suspicion now fully aroused, Astbury began a pat-frisk of Duncan's right side – the area into which Duncan had placed the silver object, and the area that Duncan had just reached for, twice, against Astbury's command. Astbury felt a "hard object" in the right jacket pocket. JA 34.

Immediately, Astbury grabbed Duncan's arms, pulled them behind Duncan's back, "and asked him if it was a gun in his pocket." Id. Duncan replied, "yes, but it's not my gun." Id. Astbury posed no other questions.

Duncan's demeanor now changed – he "gave up" and stopped resisting. Id. At this point, Astbury called out "301" to Woodhead, which is the Trenton Police Department's radio code for "gun."[5] Id. at 34.

The entire interaction described above transpired in "less than two minutes." JA 136. Astbury handcuffed Duncan, called for backup, and searched Duncan's pockets. In the right pocket of Duncan's jacket, Astbury found a silver-colored Taurus .38 caliber five-shot revolver. The gun was loaded to capacity with hollow-point bullets. Without

---

[5] He used a code, instead of simply saying "gun," because often "if you say gun, somebody who has a gun, it may startle them, may think that we're trying to get that gun off of them, make them more nervous and make the situation even worse." JA 130. On the other hand, "if somebody who has a gun knows that the police know [they] have a gun . . . it makes the situation a little bit easier." JA 129. In addition, "if I know it's a gun, I can go inside of his pocket more carefully and get it out rather than just going in there and not knowing what it is." JA 129-30.

14

being questioned further, Duncan repeated – approximately five times – that the gun was not his, that he had a story, and that the story was that he had borrowed the jacket from someone else. The officers placed Duncan into the back of their car and brought him to the police station.

On April 13, 2006, a grand jury indicted Duncan on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) & (2). The District Court heard argument on and denied Duncan's suppression motion on October 3, 2006, holding that the public safety exception applied to Duncan's response to Detective Astbury, and that Duncan's subsequent explanations were volunteered statements. Duncan's trial began later that day, and on October 6, 2006, a jury found him guilty. On January 8, 2007, the District Court sentenced Duncan to 78 months imprisonment. This appeal followed.

II.

In Miranda, the Supreme Court found that certain procedures are necessary to protect an individual's Fifth Amendment right to be free from compelled self-incrimination while subject to custodial interrogation.[6] See 384 U.S. at 468. These

---

[6] Warnings pursuant to Miranda are required only if a suspect is both in custody and subject to interrogation. Here, the parties agree that Duncan was subject to custodial interrogation. Duncan was in custody for Fifth Amendment purposes because Astbury was attempting to restrain Duncan while frisking him. See California v. Beheler, 463 U.S. 1121, 1125 (1983) (holding that Fifth Amendment custody is a "restraint on freedom of movement of the degree associated with a formal arrest") (quotation marks omitted). Astbury's question was interrogation because, if answered in the affirmative, it was likely

15

procedures include the now-familiar requirement that a suspect be "Mirandized," or, in other words, be

> warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. Without a "voluntary, knowing, and intelligent waiver" of these rights, police may not "question a suspect without counsel being present [nor] introduce at trial any statements made during the interrogation." Alston v. Redman, 34 F.3d 1237, 1242 (3d Cir. 1994).

In Quarles, however, the Supreme Court recognized that certain situations demand an exception to the Miranda rule, specifically where the safety of the public or the police is jeopardized. See 467 U.S. at 655-56. In Quarles, a woman approached two police officers on patrol in Queens and said that a man had raped her and then fled on foot into a supermarket. She gave a detailed description of the perpetrator and told the police that he was carrying a gun. The officers entered the supermarket and saw Quarles, who fit the description given by the victim. Quarles ran towards the back of the store. The police ran after, apprehended, and frisked him. Quarles was wearing an empty shoulder holster. An officer handcuffed him and, without giving Miranda warnings, "asked [Quarles] where the gun was." Id. at 652. Quarles nodded his head toward some empty liquid soap

---

to elicit an incriminating response. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

cartons and said, "the gun is over there." Id. The officer searched the cartons and discovered a .38-caliber revolver. At that point, Quarles was notified that he was under arrest, and the police proceeded to give him Miranda warnings.

The Supreme Court reversed the state court's suppression of Quarles' statement that "the gun is over there." The Court held that police officers may "ask questions reasonably prompted by a concern for the public safety" without first giving Miranda warnings. Id. at 656. Moreover, the Court noted that the exception is applied using an objective, not a subjective, test, and therefore "the subjective motivation of the arresting officer" does not impact the reviewing court's analysis. Id. at 656. Instead, courts must focus on whether the situation presented an "objectively reasonable need to protect the police or the public from any immediate danger." Id. at 659 n.8.

The Court applied what amounts to a cost-benefit analysis to the protection afforded by the Miranda warnings: where police conduct non-Mirandized questioning simply to "make [their] case" against a defendant, "whatever the cost to society in terms of fewer convictions of guilty subjects . . . [will] simply have to be borne in the interest of enlarged protection for the Fifth Amendment privilege." Id. at 656-57. But where the police engage in custodial interrogation not to obtain testimonial evidence, because they "need [] answers to questions in a situation posing a threat to the public safety," then this need "outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657. The crucial distinction, which the Court

17

believed police officers "will distinguish almost instinctively," is "between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." Id. at 658-59. The Court made clear, however, that it was recognizing only a "narrow exception to the Miranda rule," one that in each case is "circumscribed by the exigency which justifies it." Id. at 658.

Application of Quarles in this case demands affirmance for two reasons. First, our facts are similar to those in Quarles itself, and the major factual discrepancy actually demonstrates a more dire exigency in the instant case. In Quarles, the police thought, but did not know, that they could be facing an armed man because of what the rape victim told them and because they saw that Quarles had an empty shoulder holster. Detective Astbury also believed, but "wasn't 100 percent sure," that he confronted an armed suspect based on his own observations of Duncan. JA 50. In each case, the officer asked just a single question, and in each case, the question was directed solely at establishing the presence of a firearm. Further, in both cases, immediately after the police located and neutralized the public safety threat, they ceased asking questions. In the words of Quarles, Detective Astbury, "in the very act of apprehending" Duncan, was "confronted with the immediate necessity of ascertaining the whereabouts of a gun which" Astbury "had every reason to believe" Duncan had just placed into his pocket. 467 U.S. at 657.

18

"So long as the gun was concealed," with its whereabouts unverified, "it obviously posed more than one danger to the public safety."[7] Id.

The factual difference between this case and Quarles is that here, Astbury had seen what he thought was a gun, and there was only one place where he thought it could be. But this means that Duncan's gun presented an even more immediate danger than did the one in Quarles. There, Quarles was handcuffed and surrounded by at least four officers at the time of questioning. Justice Rehnquist conceded that, on the facts, "there was nothing to suggest that any of the officers were any longer concerned for their own physical safety." Quarles, 467 U.S. at 655. Indeed, Justice Marshall based his dissent in part upon the remoteness of the threat: "As the other officers trained their guns on the suspect . . . .

_____

[7] Duncan attempts to distinguish this case from Quarles on the theory that "there could have been no legitimate concern for the public's safety in general because no members of the public were present." (Duncan Br. at 27.) Although the majority does not address this point, it need not detain us long because Quarles itself rejects Duncan's contention. See 467 U.S. at 658-59 (describing scope of the public safety exception as encompassing "questions necessary to secure their own safety or the safety of the public") (emphasis added). This, of course, makes perfect sense – police officers' lives are not to be sacrificed at the altar of the Fifth Amendment.

Several courts of appeals have come to the identical conclusion, reinforcing the settled point that the public safety exception covers questions designed to secure the safety of police officers. See, e.g., United States v. Estrada, 430 F.3d 606, 612 (2d Cir. 2005) (noting that "the public safety exception clearly encompasses questions necessary to secure the safety of police officers"); United States v. Reyes, 353 F.3d 148, 154-55 (2d Cir. 2003); United States v. Lackey, 334 F.3d 1224, 1227-28 (10th Cir. 2003) (stating that "the concern of the public-safety doctrine extends beyond safety to civilians. The exception undoubtedly extends to officers' questions necessary to secure their own safety.") (quotation marks omitted); United States v. Carrillo, 16 F.3d 1046, 1050 (9th Cir. 1994); United States v. Edwards, 885 F.2d 377, 384 n.4 (7th Cir. 1989); United States v. DeSantis, 870 F.2d 536, 539 (9th Cir. 1989).

19

Officer Kraft then handcuffed Quarles, and the other officers holstered their guns. With Quarles' hands manacled behind his back and the other officers standing close by, Officer Kraft questioned Quarles." 467 U.S. at 674-75 (Marshall, J., dissenting). Therefore, argued Justice Marshall, "[b]efore the interrogation began, Quarles had been reduced to a condition of physical powerlessness," and the public safety risk was merely hypothetical. Id. at 675 (Marshall, J., dissenting) (quotation marks and citations omitted). The majority in Quarles acknowledged that there was no precipitous threat; rather, the danger stemmed only from the possibility that "an accomplice might make use of [the gun, or that] a customer or employee might later come upon it." Id. at 657.

Here, by contrast, only two officers were present, and Astbury testified that as he approached Duncan's car, he could not see where Detective Woodhead was because he was "concentrating on Mr. Duncan's actions." JA 48. Unlike Quarles, Duncan was not handcuffed. Unlike the officers in Quarles, Astbury feared that Duncan had a gun on his person. Unlike Quarles, Duncan had not "been reduced to a condition of physical powerlessness," since he twice reached for the exact pocket that Astbury thought contained a gun. In sum, the public safety risk posed by Duncan was not a matter of "might." It was very real.

Second, and more fundamentally, admitting Duncan's response into evidence would accord with Quarles' central holding: that the Miranda warnings are not required in the face of an "objectively reasonable need to protect the police or the public from any

20

immediate danger associated with [a] weapon." 467 U.S. at 659 n.8. So we must ask: did the totality of the circumstances create such an objectively reasonable need here? I believe the answer is clearly yes.

Consider what confronted Detective Astbury at the moment he asked his single question: (1) late at night, he saw Duncan drinking alcohol; (2) when illuminated by the police spotlight, Duncan became "visibly nervous" and began moving "frantically," reaching around inside his car; (3) he saw Duncan stuff something that flashed silver into his right pocket; (4) he asked Duncan for identification, but instead of complying, Duncan exited the car and turned his back to Astbury; (5) Duncan was not handcuffed; (6) Astbury forced Duncan's hands up onto the car's roof to frisk him, but Duncan twice pulled his arms down and reached for the same pocket that contained the flash of silver; and (7) Astbury frisked that very pocket, and it contained something hard and heavy.

It was objectively reasonable to think that the totality of these circumstances created a threat to Astbury's safety, to the safety of his partner, to the safety of Duncan, and to the safety of anyone living in the houses on Ardmore Avenue. Indeed, if Astbury had ignored the objectively reasonable threat posed by that hard, heavy flash of silver in Duncan's pocket, and the gun had gone off, this panel could well be deciding a tort or civil rights action today.

III.

21

Each public safety case presents its own "kaleidoscopic situation," with its own unique factual scenario. Quarles, 467 U.S. at 656. Nonetheless, three factors are useful in determining whether or not the public safety exception applies. The first factor is the questions the police ask. Relevant here are how many questions were asked; the scope of these questions; and most importantly, the content – in other words, were the questions investigatory or safety-related. The second factor is what the police knew about the defendant at the time of the encounter. A court may thus consider facts such as whether the defendant is suspected of crimes involving weapons or violence; and whether the officers had any knowledge or belief as to the defendant's potential dangerousness. The third factor examines the characteristics of the encounter: whether the defendant was handcuffed or otherwise secured; whether the defendant made furtive, irregular, or other disconcerting movements; and the general dangerousness of the atmosphere.

I am not suggesting that these three factors constitute a "test" to the exclusion of all other possible factors. Of course, the totality of the circumstances is the touchstone for any inquiry into the public safety exception's applicability. But when examining the totality of the circumstances, these three factors are useful in analyzing whether the public safety exception should apply. In the instant case, all three factors point clearly to application of the public safety exception in this case.[8]

---

[8] Our Court has never dealt squarely with the public safety exception. Only United States v. DeSumma, 272 F.3d 176 (3d Cir. 2001), discusses the doctrine in any detail, and does so only in dicta.

22

A.

The Supreme Court's object in Miranda was to prohibit the authorities, when seeking to solve a crime, from using the coercion inherent in custodial interrogation to compel a suspect to incriminate himself. But the Quarles Court recognized that when faced with an "exigency requiring immediate action," 467 U.S. at 659 n.8, the police are not asking questions "designed solely to elicit testimonial evidence," id. at 659. Rather, when public safety is legitimately at risk, the police seek answers that will expose, and eliminate, the public safety threat. The purpose of the exception, of course, is to defuse dangerous situations, and the questions posed by the police must be geared toward that – and only that – goal. Such questions, "necessary to secure [the police's] safety or the safety of the public," are permissible under the Fifth Amendment. Id.

Thus, the first factor used to determine whether the public safety exception applies is the questions the police ask. Relevant here are the number of questions asked; the scope of the questions; and the content of the questions, in other words, whether they are safety-related (limited solely to gaining the information needed to eliminate the danger) or testimonial (geared towards solving a crime).

When an officer asks just one question directed at uncovering the threat and then stops, this factor weighs in favor of applying the public safety exception to the defendant's answer. For example, in Quarles itself, the officer asked just a single question (where was the gun) before reciting Miranda warnings. Only after securing the

23

gun and giving the warnings did the officer "continue[] with investigatory questions about the ownership and place of purchase of the gun." Id. at 659. This indicated that the officer's question sought to eliminate a threat, not obtain evidence. See also United States v. Reilly, 224 F.3d 986, 993 (9th Cir. 2000) (applying public safety exception in part because officer's "inquiry was narrow, asking only a single question directed at determining the presence of [a] gun"); Carrillo, 16 F.3d at 1050 (applying public safety exception where even after defendant gave an incriminating response to single question, officer asked no more questions, since this "deliberate refusal to pursue the subject heightens our confidence that, in this case, the narrowly tailored question was a reasonable attempt by a police officer to ensure his personal safety in the midst of a search").

Next, questioning with a limited scope – such as an inquiry that requires just a yes or no answer – points towards permitting the answer under the public safety exception. This was the case in Carrillo, where before frisking a drug dealer, an officer asked whether the dealer had any needles on him. 16 F.3d at 1049. The Quarles exception applied in part because of "the non-investigatory nature of the officer's question. The question called for a 'yes' or 'no,' not a testimonial response. Ordinarily, a question framed in this manner would not elicit any incriminating evidence not produced by the

24

search itself."[9]  16 F.3d at 1049-50; see also Allen v. Roe, 305 F.3d 1046, 1051 (9th Cir. 2002) (applying exception in part because after locating gun, and thereby eliminating safety threat, officer did not ask defendant "any further questions after the gun was retrieved.  The officer did not ask Allen . . . any other questions regarding the crime.")

Finally, there is a critical distinction between questions asked to defuse a dangerous encounter and questions that seek to solve a crime.[10]  In Allen, for instance, an

_____

[9] It follows that, generally, the more questions asked by the police, and the broader their scope, the less likely the public safety exception should apply.  This is not to say, however, that only the narrowest possible question will be permitted, as courts have recognized universally that "public safety questions are framed spontaneously in dangerous situations.  Precision crafting cannot be expected in such circumstances." Newton, 369 F.3d at 678 (finding permissible question inquiring whether there was any "contraband" – not simply a firearm – in defendant's home).  Thus, questions "need not be posed as narrowly as possible . . . in the circumstances of a tense and dangerous arrest."  Estrada, 430 F.3d at 612.  Accordingly, "a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety."  Id.; see also United States v. Newsome, 475 F.3d 1221, 1223, 1225 (11th Cir. 2007) (permitting question with "broad phrasing" – whether there was "anything or anyone in the room that [police] should know about" – because "[t]he officer asked what was necessary to secure the scene. . . .  An officer is not expected to craft a perfect question in the heat of the moment."); United States v. Williams, 181 F.3d 945, 954 n.13 (8th Cir. 1999) (permitting answer to question "is there anything we need to be aware of," even though "the officer did not specifically refer to weapons or safety concerns," because "conditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to" exception's purpose).

[10] We must also recognize why this inquiry does not run afoul of the Quarles Court's admonishment that the officer's subjective intent is irrelevant.  As the Court of Appeals for the Sixth Circuit has explained:

[t]hough evidence of pretext[ual questioning asked only to obtain

25

officer asked a man who had just shot his son at a campsite, and who had discarded the gun somewhere in the woods, to try and help the police find the gun. The Court of Appeals for the Ninth Circuit permitted the man's answer in large part because "there was no indication that the officer's questioning was intended to elicit incriminating evidence. . . . The questioning was limited to finding the gun and was not investigatory." Id. at 1051 (citations omitted). Another example is Reilly, where the police arrested a defendant suspected of numerous robberies and armed carjackings, and asked him "[w]here is the gun." 224 F.3d at 990. The Quarles exception applied because the question "b[ore] no indication of an attempt to elicit testimonial evidence." Id. at 993. The inquiring officer "did not ask his question in an attempt to link Reilly to the bank robberies," and although it "called for more than a simple 'yes' or 'no' answer," the question required "only the bare minimum necessary to locate and contain a potential threat." Id.

---

testimonial evidence] goes most directly to the officer's subjective beliefs (rather than the objective reasonableness of those beliefs), we consider such evidence to the extent that it informs our understanding of the objective circumstances. Generally, the fact that an officer was willing to manipulate the scene of an arrest in order to gather evidence makes it unlikely that he could have formed an objectively reasonable belief that he was in danger.

United States v. Williams, 483 F.3d 425, 429-30 (6th Cir. 2007). Thus, courts may consider an officer's questions not to determine the subjective intent of the officer, but rather to examine the objective reasonableness of the officer's belief that he or she confronted an imminently dangerous situation. If an officer has the time to ask questions that seek to solve a crime, and not just to eliminate a safety threat, then this fact may tend to demonstrate that there was no "objectively reasonable need to protect the police or the public." Quarles, 467 U.S. at 659 n.8.

26

Accordingly, answers to questions that are "narrow in scope, directly targeting the safety concern, and [] not posed to elicit incriminating evidence," will often be permissible pursuant to the public safety exception. Estrada, 430 F.3d at 613 (permitting answers to several "focused" questions regarding whether guns were in the apartment of a known drug dealer, as "the questions were aimed at controlling a potentially dangerous situation and relieving an immediate threat to the officers' safety," and not "a subterfuge for collecting evidence"); see also United States v. Brady, 819 F.2d 884, 888 (9th Cir. 1987) (admitting answer to questions including "Do you have a gun?" because they were "not designed to elicit testimonial evidence. That is, they were not investigatory," instead arising from officer's "concern with public safety, his desire to obtain control of what could be a dangerous situation").

Applying this first factor to the instant case leads to only one conclusion: Duncan's statement in response to Detective Astbury's question was well within the scope of the public safety exception.

First, Astbury posed only a single question. The question was nearly identical in form to those upheld by other courts, and numerous courts have held that even multiple questions can fall within the exception. See, e.g., Newsome, 475 F.3d at 1223; United States v. Fox, 393 F.3d 52, 56-57 (1st Cir. 2004) (remanded for further consideration in light of United States v. Booker, 543 U.S. 220 (2005), by Fox v. United States, 545 U.S. 1125 (2005), conviction and sentence upheld by United States v. Fox, 429 F.3d 316 (1st

27

Cir. 2005)); Newton, 369 F.3d at 663-64, 678-79; United States v. Khalil, 214 F.3d 111, 115 (2d Cir. 2000); United States v. Kelly, 991 F.2d 1308, 1311 (7th Cir. 1993); Fleming v. Collins, 954 F.2d 1109, 1111 (5th Cir. 1992) (en banc); Edwards, 885 F.2d at 384-85; Brady, 819 F.2d at 888.

Second, Astbury asked the most narrow kind of question possible, requiring only a "yes" or "no" answer. See Carillo, 16 F.3d at 1049-50. Far broader questions, calling for more testimonial responses, have been upheld under Quarles. See, e.g., Newsome, 475 F.3d at 1223 ("anything or anyone in the room that [police] should know about"); United States v. Martinez, 406 F.3d 1160, 1163 (9th Cir. 2005) ("what are those [weapons] doing there"); United States v. Luker, 395 F.3d 830, 832 (8th Cir. 2005) ("if there was anything in Luker's vehicle that shouldn't be there or that [the police] should know about"); Newton, 369 F.3d at 663 (inquiry regarding "contraband"); Williams, 181 F.3d at 953 ("is there anything we need to be aware of"); Fleming, 954 F.2d at 1111 ("[w]ho shot you," "[w]ho was with you," "[w]here is the gun"); United States v. Knox, 950 F.2d 516, 517 (8th Cir. 1991) ("where [is] the gun"); Padilla, 819 F.2d at 960 ("whether defendant was okay" and "how about inside the house").

Third, Astbury's question was in no way investigatory. As soon as Duncan answered the one question posed, Astbury stopped his questioning immediately. He did not ask why Duncan had the gun; he did not ask whether Duncan had a permit for the gun; he did not ask whether Duncan owned the gun; he did not ask whether Duncan had

28

been previously convicted of a crime; he did not ask anything else. In Quarles, "Officer Kraft asked only the question necessary to locate the missing gun before advising [Quarles] of his rights," which demonstrated to the Court that the question was necessary to secure the public safety, and not to further the investigation. 467 U.S. at 659. Similarly, Astbury's "disinclination to exploit the situation suggests that his question was a reasonable attempt to 'insure his personal safety in the midst of a search.'" Reyes, 353 F.3d at 154-55 (quoting Carillo, 16 F.3d at 1050). The narrow scope of Astbury's single question, which he did not follow with any other inquiries, indicates an attempt to dispel an immediate threat, not an effort to obtain incriminating evidence.

For these reasons, the first factor used to assess the public safety doctrine weighs strongly in favor of applying it here.

B.

The second factor is what the police knew about the defendant at the time of the encounter. A court's analysis of this factor compels consideration of two subsidiary questions: (1) whether the defendant is suspected of inherently violent crimes; and (2) whether the police have reason to think that the particular defendant is potentially dangerous. If the answers to either of these questions are in the affirmative, then this factor favors employing the public safety exception. In other words, if the police have such knowledge, the exception permits them "to follow their legitimate instincts when

29

confronting situations presenting a danger to the public safety."[11]  Quarles, 467 U.S. at 659.

First, the type of crime attributed to the suspect impacts our analysis of whether the public safety exception applies.  Specifically, when an individual is suspected of a crime that typically involves weapons or violence – such as illegal gun possession, murder, rape, robbery, assault, or bank robbery – such potential dangerousness can factor into the objective reasonableness of questions asked before provision of Miranda warnings, and it is more likely that the public safety exception will permit admission of answers to an officer's questions regarding the presence of any weapons.  See, e.g., Williams, 483 F.3d at 429 ("it may be objectively reasonable to believe that Williams had a weapon in his apartment based solely on the violent crimes that he allegedly had committed, aggravated

---

[11] It is true that the public safety exception is applied using a standard of objective reasonableness.  See Quarles, 467 U.S. at 656.  This is because in fast-moving, dangerous situations, "spontaneity rather than adherence to a police manual is necessarily the order of the day," and therefore "the application of the exception . . . should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer."  Id.; see also United States v. Holt, 264 F.3d 1215, 1225-26 (10th Cir. 2001) ("That one officer is braver (or more foolhardy) than another, and therefore not subjectively concerned for his or her safety, should not deprive that particular officer of a right to protect his or her safety.  Even the brave officer should be allowed to minimize the ever-present risk of being attacked or killed.").  Accordingly, courts are not to enter the mind of the arresting officer and assess the officer's intention when asking the challenged questions.  But we must distinguish this prohibition from a related inquiry that is wholly proper:  what the officers knew about the defendant when they confronted one another.  What the police officers knew is essential to determining whether their actions were objectively reasonable, and does not overlap with their subjective reasons for asking their questions.

30

rape and aggravated robbery"); Estrada, 430 F.3d at 613 (observing that where arresting officers knew that defendant had convictions for assault, they "had an objectively reasonable need to protect themselves from immediate danger" because "considering [defendant's] assault convictions, the officers had reason to believe that [he] was capable of violence"); United States v. Shea, 150 F.3d 44, 48 (1st Cir. 1998) (affirming admissibility of defendant's answer to question "whether he had any weapons" in part because "the agent had just apprehended an individual suspected of attempting to commit a violent crime, armed bank robbery") (recognized as abrogated on other grounds by United States v. Mojica-Baez, 229 F.3d 292, 310 (1st Cir. 2000)).

Thus, the police may generalize about individuals suspected of certain kinds of crimes, and the public safety threats that those types of individuals typically present, because of the presumption that individuals suspected of violent crimes may well present a danger to public safety.[12]

---

[12] Indeed, at least four courts of appeals have held admissible, pursuant to the public safety exception, answers to questions commonly posed to suspected drug users and dealers – such as whether they possess guns or needles – even without any specific, articulable fear of the particular suspect. See Estrada, 430 F.3d at 613 (determining that police's knowledge that suspect kept drugs in apartment "gave rise to a reasonable belief that he also kept a gun there. We have often recognized that firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers."); Luker, 395 F.3d at 833-34 (permitting defendant's admission that a shotgun was in his car because officers "were aware of Luker's history of methamphetamine use"); Carrillo, 16 F.3d at 1049 (concluding that public safety exception permitted admission of answer to question whether suspect had any needles or drugs on him because officer's question "stemmed from an objectively reasonable need to protect himself from immediate danger," and even though "[t]he risk [of avoiding contact with syringes and toxic substances] differs from

31

Second, if the police know of a underline specific threat posed by a underline particular suspect, that knowledge can make a police officer's decision to ask questions without warnings more objectively reasonable. In underline Quarles itself, the victim told the police that she had just been raped – an inherently violent crime – and that the defendant was carrying a gun, and so was potentially dangerous. underline See 467 U.S. at 651-52. This knowledge permitted the police to "neutralize the volatile situation" they confronted by asking the defendant non-Mirandized questions. underline Id. at 658.

*Newton* is another good example of a case where officers' knowledge of a specific defendant's potential dangerousness factored into the court's public safety analysis. Newton lived with his mother after being paroled. Newton's mother contacted the authorities, claiming that Newton had threatened to kill her and her husband, and that Newton kept a gun in a shoe box by the door. Six officers went to the residence, and when Newton answered the door in his underwear, the officers told him to step into the hallway. They handcuffed him. An officer asked Newton whether he had any contraband, and Newton replied, "only what is in the [shoe] box." underline Newton, 369 F.3d at

that presented by a gun, [] the danger of transmission of disease or contact with harmful substances is real and serious enough; a pressing need for haste is not essential"); underline Edwards, 885 F.2d at 380, 384, 384 n.4 (affirming admission of answers to several questions, including presence of gun, posed to handcuffed suspected drug dealer, because "drug dealers are known to arm themselves, particularly when making a sale," and thus officer had "an objectively reasonable need to protect himself, his partner, and the public [] from the immediate danger that a weapon would pose"); underline see also underline United States v. underline Webster, 162 F.3d 308, 332 (5th Cir. 1998) (affirming admission of incriminating answer to question whether defendant had any needles in his pockets).

664. The officer asked what was in the box, and Newton replied "a two and two." Id.

The Court of Appeals for the Second Circuit held that the public safety exception applied,

in large part because

> the officers who went to the apartment to perform the search knew that [Newton's mother] had recently reported both her son's possession of a firearm in their home and his threats to kill her and her husband. This information supported an objectively reasonable belief that Newton was dangerous, that he and his family were involved in a volatile domestic dispute, and that, until the gun was found, there was a serious and immediate risk of harm to anyone in the apartment.

Id. at 678; see also Newsome, 475 F.3d at 1223, 1225 (applying Quarles exception where

police, knowing that Newsome was suspected of a shooting, handcuffed him and asked if

there was "anything or anyone in the room that [he] should know about," because "the

officers knew that they were dealing with a possibly armed, violent felon," and so "[t]he

officers reasonably believed that they were in danger, and they acted accordingly to

protect themselves . . . in making the arrest"); Martinez, 406 F.3d at 1162, 1165-66

(applying exception when officer, answering a domestic violence call complaining of an

"out of control" man at the house, recognized the address as one to which he had

previously been sent on a domestic violence incident); Reyes, 353 F.3d at 154 (finding

important that officers knew defendant was often armed in reversing District Court's

suppression of defendant's response that he had a gun, as "the arresting officer here had

an objectively reasonable belief that Reyes . . . [had] a firearm on his person" because

33

"[t]he officers [had] a solid basis for the belief that Reyes was armed and that the concealed weapon posed a danger to the police and to the public").

In Quarles and other cases, third parties provided the police with knowledge of a possible public safety threat. But perhaps even more relevant is a police officer's suspicion concerning a particular suspect based on the officer's personal observations. For example, in Kelly, an officer stopped Kelly for speeding, and noticed alcohol bottles and drug paraphernalia in Kelly's car. See 991 F.2d at 1310-11. When the officer asked to search him, Kelly reached into his pocket and "pulled out a fistful of change which contained several .22 caliber cartridges." Id. at 1311. This display concerned the officer, and so he "asked Kelly if he had a gun." Id. When Kelly did not answer, the officer "asked if the gun was in the trunk," to which Kelly replied that the gun was "on me." Id. Although the Court of Appeals for the Seventh Circuit disposed of the case by holding that Kelly was not in custody for Fifth Amendment purposes, it observed that "once Kelly produced the .22 cartridges in response to Dixon's query about drugs, Dixon was permitted to pursue the question of the location of the gun under the public safety exception." Id. at 1313.

Similarly, in Knox, the police knew from their interactions with the suspect that he was potentially dangerous. See 950 F.2d at 517. There, the police noticed an empty car with its engine running, with footprints in the snow leading to a nearby building. They saw Knox and a woman exit the building and questioned Knox, who acted nervously.

34

One officer "conducted a pat search, felt something resembling a knife in a jacket pocket, and reached inside where he found a loaded magazine for a .38-caliber pistol" and drugs. Id. After arresting Knox, "[t]he officers asked him where the gun was, and he told them it was under the front seat of his car, where they retrieved it." Id. The Court of Appeals for the Eighth Circuit affirmed the district court's refusal to suppress the gun, holding that "public safety concerns were present here. Knox was carrying cocaine and a loaded magazine but no gun. The police were justified in making an immediate attempt to locate the gun to eliminate this danger to themselves and to others in the area."[13] Id. at 519.

On our facts, Astbury knew more about Duncan's potential dangerousness than did the police in many cases that have applied the public safety exception based at least in part on the police's knowledge of potential dangerousness. First, of course, Astbury had greater reason to fear Duncan than did the police in any of the cases cited above that

---

[13] None of the above discussion is intended to imply that evidence of a defendant's dangerousness is required to apply the exception. At least two courts have held that even where the police have no knowledge that a weapon might be present – from any source – the exception can nevertheless apply. See United States v. DeSantis, 870 F.2d 536, 539 (9th Cir. 1989) (affirming under Quarles admission that gun was in closet where defendant, served with arrest warrant at home, asked if he could go to the bedroom to change his clothes, and officer asked him "whether there were any weapons in the bedroom." The Court of Appeals for the Ninth Circuit held that it was "of no consequence" that "the inspectors had no reason to suspect that a gun might be present and had no reason to fear DeSantis."); Brady, 819 F.2d at 888 (where a potentially unstable crowd had gathered at the arrest scene, exception applied notwithstanding that police had no "reason to believe that Brady had disposed of a gun in a place where it posed an immediate public danger," and that in fact "[t]here was no [] indication that Brady possessed a weapon").

permitted answers to public safety questions based solely on the fact that the defendant was suspected of a crime involving guns or violence. In such cases, the police do not know that the specific person they confront is dangerous – that there will in fact be a public safety threat – but only that a certain category of suspect is often dangerous. See, e.g., Williams, 483 F.3d 425, 429; Estrada, 430 F.3d at 613; Luker, 395 F.3d at 833-34; Shea, 150 F.3d at 48; Carrillo, 16 F.3d at 1049; Edwards, 885 F.2d at 384. Here, by contrast, Astbury knew that Duncan, specifically, could be dangerous because Astbury personally observed Duncan with a silver object that might have been a gun.

Further, Astbury had more direct knowledge that Duncan could pose a threat to him and his partner than the cases cited above where the police's information regarding dangerousness came from third parties. See Quarles, 467 U.S. at 651-52; Newsome, 475 F.3d at 1222-23; Martinez, 406 F.3d at 1165; Newton, 369 F.3d at 678; Reyes, 353 F.3d at 150. But all of these decisions, too, permitted admission of answers to public safety questions due, in part, to the police's second-hand knowledge that the defendant could be dangerous.

Here, however, Astbury relied upon his own personal observations of Duncan, as did the police in Knox and Kelly. The courts in both of those cases held that the public safety exception applied, in part because when officers learn of the defendants' dangerousness from their own observations, this favors application of the public safety exception. In Kelly, once the officer saw the .22 caliber cartridges among a handful of

36

change, he "was permitted to pursue the question of the location of the gun under the public safety exception." 991 F.2d at 1313. In <u>Knox</u>, once the officer first felt and then retrieved the magazine, "the police questioning was lawful under the public safety exception." 950 F.2d at 519.

Just as in <u>Knox</u> and <u>Kelly</u>, Detective Astbury had an objectively reasonable basis to fear Duncan based on what Astbury observed personally during the fast-moving encounter. Astbury had come upon a man drinking alcohol who, when spotted by the police, began moving "frantically" around inside his car. JA 120. From less than seven feet away, Astbury saw Duncan "attempting to conceal a silver object in his right front pocket." JA 30. Astbury believed the object was a gun. His pat-frisk of Duncan's right pocket, revealing a hard, heavy object, strengthened his suspicions – but did not confirm them. <u>See</u> JA 50 (Astbury "wasn't 100 percent sure" that Duncan's silver object was a gun). To eliminate the uncertainty in this brief and volatile confrontation, Astbury asked if the object in the pocket was a gun. In this situation, the second factor – what Astbury knew of Duncan's potential dangerousness – strongly supports admitting in evidence Duncan's answer to Astbury's question pursuant to the public safety exception.

C.

The third factor is the characteristics of the encounter between the police and the suspect. As the Court of Appeals for the Fifth Circuit has observed, "the public safety exception should be virtually intuitively comprehensible to police officers. When the

37

danger inherent in a confrontation has passed, so has the basis for the exception."

Fleming, 954 F.2d at 1114. Accordingly, relevant inquiries include whether the suspect was handcuffed or otherwise secured; whether the suspect made furtive, irregular, or disconcerting movements; and the general dangerousness of the atmosphere.

Duncan was not handcuffed but rather was only being held by Astbury. Numerous courts have held that the answers of far more subdued defendants were properly admitted pursuant to the public safety exception. Indeed, many courts have held that even where a defendant is handcuffed, the public safety exception can apply. Remember that in Quarles itself, the defendant was handcuffed when questioned. See 467 U.S. at 655. The Court decided, however, that the danger to unsuspecting civilians sufficed to apply the exception. Id. at 657; see also United States v. Liddell, 517 F.3d 1007, 1008 (8th Cir. 2008) (applying exception when after defendant was removed from his car, arrested, handcuffed, and put in back of police car, police found an unloaded gun under front seat and then asked whether there was "anything else in [the car] we need to know about"); Newsome, 475 F.3d at 1225 (determining that exception applied where defendant was handcuffed on floor because "officers reasonably believed that they were in danger"); Luker, 395 F.3d at 835 (applying exception where defendant had already been arrested, handcuffed, and patted down); Newton, 369 F.3d at 678 (holding that public safety issue remained notwithstanding that Newton was handcuffed and in hallway outside his apartment because "the unlocated gun presented a deadly risk to everyone on the

38

premises"); Lackey, 334 F.3d at 1225-27 (finding "a real and substantial risk to the safety of the officers and Defendant" after defendant was handcuffed and led away from his car); Williams, 181 F.3d at 948, 950, 953-54 (permitting answer to question posed to a "frail and elderly looking" defendant handcuffed and lying in bed).

As even a handcuffed defendant can pose a threat to an officer's safety, an uncuffed defendant poses a particularly acute danger. For example, in Reyes, the police had apprehended, but not yet handcuffed, Reyes when they asked him questions before reciting the Miranda warnings. See 353 F.3d at 154. The police knew that Reyes was often armed, and therefore "there was a risk that Reyes was carrying a loaded gun that could accidentally be discharged during a search." Id. Combined with the fact that Reyes "was not yet handcuffed" and so "still could have reached for a concealed weapon," the Court of Appeals for the Second Circuit held that "[t]he officers had a solid basis for the belief that . . . the concealed weapon posed a danger to the police and to the public."[14] Id.

---

[14] Indeed, when the defendant is not yet handcuffed, even when the situation is seemingly very secure, courts have applied the public safety exception. See, e.g., Padilla, 819 F.2d at 960 (applying exception where, after receiving report of a man firing shots, police confronted defendant, ordered him to drop his weapon, made him lie on his stomach spread-eagle, and then asked him questions); Estrada, 430 F.3d at 608-09, 613-14 (applying exception where defendant was lying face-down on the floor, with one officer standing over and attempting to handcuff him, when another officer asked about weapons in the apartment); Reilly, 224 F.3d at 993 (upholding question "where is the gun" posed to suspect who was subdued and surrounded by police with weapons drawn, in part because defendant "was not yet handcuffed and still had the capacity to reach and grab any nearby objects").

The situation posed by <u>Reyes</u> is exactly the situation here. Just as in <u>Reyes</u>, Duncan was not yet handcuffed. Just as in <u>Reyes</u>, Astbury had a "solid basis for the belief" that Duncan well might be armed. Just as in <u>Reyes</u>, Duncan "still could have reached for a concealed weapon," and indeed Duncan twice made movements towards exactly the area where the weapon was later found. Accordingly, just as in <u>Reyes</u>, Astbury "had a solid basis for the belief that . . . the concealed weapon posed a danger to the police and to the public." 353 F.3d at 154.

The next inquiry examines a defendant's furtive, irregular, or disconcerting movements, which can heighten the safety threat to officers and strengthen the applicability of the <u>Quarles</u> exception. The situation in <u>Fox</u> was similar to our own. 393 F.3d 52. After stopping Fox's car for a traffic violation, the officer activated his car's spotlight and "observed that Fox, the vehicle's sole occupant, 'was moving around . . . more than . . . normal for an average traffic stop.' He also saw Fox make a ducking motion, as if 'reaching for something under the seat or placing something under the seat.'" <u>Fox</u>, 393 F.3d at 56 (ellipses in original). The officer exited his vehicle and recognized Fox as someone he had previously arrested for firearm possession. The officer "then noticed a large bulge in Fox's left inside jacket pocket," and ordered Fox to exit the vehicle. <u>Id.</u> A frisk revealed brass knuckles and an unused shotgun shell on Fox's person. The officer then asked Fox, without providing <u>Miranda</u> warnings, to locate the gun that went with the shell. This questioning led to the discovery of a shotgun in

40

Fox's car. The Court of Appeals for the First Circuit upheld the district court's denial of Fox's suppression motion because "[u]nder the circumstances, [the officer] was permitted to ask Fox whether he possessed any weapons . . . . Having found the live shell and realized that he had previously arrested Fox for possessing a firearm, [the officer] had ample reason to fear for his own safety and that of the public." Id. (citation omitted).

In Reilly, too, the defendant's furtive movements factored into the court's decision to apply the public safety exception. See 224 F.3d 986. The police learned that Reilly, a suspect in dozens of bank robberies and an armed carjacking, was staying in a motel room. Five officers burst into the room, three with guns drawn, and ordered Reilly to lie face-down on the floor. Reilly complied, but as one agent approached to handcuff him, Reilly "began to bring his arms to his front waistband, and the agents told him to reposition his arms, which he did." Id. at 990. One agent then asked Reilly, "Where is the gun?" to which Reilly replied that it was in a black bag in the bedroom. Id. The Court of Appeals for the Ninth Circuit affirmed the district court's denial of Reilly's motion to suppress. The officer asked about the gun "only after Reilly started to bring his hands to his waistband, a place where weapons are frequently concealed. The officers had no idea whether Reilly was armed or not, and this suspicious move reasonably caused Agent Johnson to fear that Reilly might be reaching for a weapon." Id. at 993. The Court concluded that "[t]here was an objectively reasonable need on the part of the officers to protect themselves given the volatility of the situation with which they were faced." Id.;

41

see also Williams, 483 F.3d at 428 (holding that public safety exception applies "if and only if" two conditions are satisfied: "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it," and that while second prong would not apply, for instance, if the police entered a defendant's room, handcuffed him, and placed him on a chair in the hallway outside his room, it might apply if defendant was "unrestrained and had turned back into his room to retrieve his identification" when questioned by the police).

Comparing Fox and Reilly to our case leads to the inescapable conclusion that the third factor favors applying the public safety exception to Duncan's answer to Astbury's question. Exactly as in Fox, when Astbury's spotlight first hit him Duncan began "'moving around . . . more than . . . normal for an average traffic stop,'" and "ducking [down], as if 'reaching for something under the seat or placing something under the seat.'" 393 F.3d at 56 (ellipses in original). Duncan then exited his car against Astbury's instructions. Once out of the car, he twice wrestled his arms down from the roof of the car and moved for his right jacket pocket, the area that Astbury believed contained a gun. All of this took place within the span of "less than two minutes." JA 136.

Accordingly, as in Fox and Reilly, Duncan made fast and worrisome movements both while inside and after exiting his car. And as in Reilly, Astbury asked his question only after Duncan reached twice for his pocket, "a place where weapons are frequently concealed," and the place where Astbury in fact had reason to think that Duncan had a

42

weapon concealed. 224 F.3d at 993. Thus, "this suspicious move reasonably caused [Astbury] to fear that [Duncan] might be reaching for a weapon." Id.

For all these reasons, I believe that the characteristics of the encounter between Astbury and Duncan favor admitting Duncan's answer pursuant to the public safety exception.

IV.

The majority is absolutely correct when they note that Quarles created only a "narrow exception" to the rule of Miranda. 467 U.S. at 658. Nonetheless, I believe Duncan's statement should not be suppressed because the totality of the facts and circumstances here clearly caused Astbury to have an objectively reasonable fear for his safety. Again, I believe that the following factors may be considered in examining the totality of the circumstances to determine whether the public safety exception should apply: first, what questions the police ask, including the number, scope, and purpose (investigatory or safety-related); second, what the police knew about the defendant at the time of the encounter, including whether the defendant was suspected of a crime involving weapons or violence and whether the police had information that the defendant was potentially dangerous; and third, the characteristics of the encounter: whether the defendant was handcuffed or otherwise secured, whether the defendant made furtive, irregular, or disconcerting movements, and how dangerous the atmosphere appeared.

For the reasons set forth above, I respectfully concur with the majority's opinion.

43

_____

POLLAK, District Judge, concurring.

I join Judge Rendell's opinion for the court without reservation. The opinion places in exact focus the facts yielding an answer to the question whether this is an instance in which the familiar directive of *Miranda v. Arizona,* 384 U.S. 436 (1966), that a person in custody must be "Mirandized" before any questioning is permissible is subject to the *New York* v. *Quarles,* 467 U.S. 649, 658 (1984), "narrow exception to the *Miranda* rule," authorizing the police to ask one who has not yet been Mirandized "questions necessary to secure their own [the police officers'] safety or the safety of the public." *Id.* at 659. Judge Rendell's opinion for the court concludes that under the facts of record in the case at bar the challenged police question was justified by *Quarles*, but characterizes this as "a close case given the narrowness of the exception." I agree with Judge Rendell.

Judge Chagares joins the court's judgment upholding appellant's conviction but, as he explains, "I write separately because I do not believe that the application of *Quarles* here presents a 'close case.'" In aid of his differing view Judge Chagares argues that, in cases posing the *Quarles* question, "three factors are useful in determining whether or not the public safety exception applies. The first factor is the questions the police ask. . . . The second factor is what the police knew about the defendant at the time of the encounter. . . . The third factor examines the characteristics of the encounter. . . ." Of course one or more of these factors, as adumbrated by Judge Chagares, may be of analytic assistance in a particular case. So may other factors. I would, however, think it would be

45

unhelpful for this court to draw a standard *Quarles* blueprint against which trial judges would be expected to measure the manifold fact-patterns of arrest and resultant custody. In *United States v. Reyes,* 353 F.3d 148 (2d Cir. 2003), the Second Circuit cogently warned against pursuing generalizations that may obscure the particularized question that must be addressed in every case — namely, was this a situation in which, objectively assessed, the safety of the police or the public warranted postponement of the *Miranda* warning?  "The public safety exception," said the court, "permits questions 'reasonably prompted by a concern' for safety and in each case 'will be circumscribed by the exigency which justifies it.'" *Id*. at 152 (*quoting Quarles,* 467 U.S. at 656, 658).  "Like the reasonableness standard itself," the court continued, "the public safety exception is 'a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case.'" 353 F.3d at 152 (*quoting United States v. Banks*, 540 U.S. 31, 36 (2003)).

In *Reyes*, the Second Circuit ruled, as we do here, that the challenged police questioning, which elicited inculpatory response, was warranted by *Quarles*.  The court was, however, at pains to point out that its ruling was specific to the facts before it:  "We emphasize that it cannot become a matter of course to precede every *Miranda* warning with the questions that were put to Reyes.  We remain vigilant that 'a right enshrined in the words of the Constitution is not lost in the reality of the street.'"  353 F. 3d at 155 (*quoting United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

46